[No. C015216. Third Dist. Apr. 24, 1996.]

BECK DEVELOPMENT CO., INC., Plaintiff and Respondent, v.
SOUTHERN PACIFIC TRANSPORTATION COMPANY, Defendant and
Appellant.

[No. C015905. Third Dist. Apr. 24, 1996.]

BECK DEVELOPMENT CO., INC., Plaintiff and Appellant, v.
DEPARTMENT OF TOXIC SUBSTANCES CONTROL, Defendant and
Appellant;
CITY OF TRACY, Defendant and Respondent.

**COUNSEL**

Freeman, Brown, Hartmann, Sperry & D'Aiuto, Gerald A. Sperry, Glen C. Hansen and James Belford Brown for Plaintiff and Appellant in No. C015905 and for Plaintiff and Respondent in No. C015216.

Diepenbrock, Wulff, Plant & Hannegan, John S. Gilmore and Charity Kenyon for Defendant and Appellant in No. C015216.

Daniel E. Lungren, Attorney General, Charlton G. Holland III, Assistant Attorney General, Dennis Eckhart and Michael V. Hammang, Deputy Attorneys General, for Defendant and Appellant in No. C015905.

Kroloff, Belcher, Smart, Perry & Christopherson and Orlie L. Curtis for Defendant and Respondent.

## OPINION

**SPARKS, Acting P. J.**—In these consolidated appeals we consider issues arising out of the subsurface contamination of land. Among other points, we consider the nature and propriety of a moratorium recommendation by the state agency responsible for toxic substance control. We also examine the relationship between the laws dealing with hazardous waste properties and those governing land use regulation. Finally, we consider public and private nuisances, the statute of limitations on nuisances and the various rules for determining whether a nuisance is permanent or continuing.

The property in question belongs to the Beck Development Co., Inc. (Beck), and is located in the City of Tracy (the City) in San Joaquin County. The contamination occurred through the ownership and use of the property by Southern Pacific Transportation Company (Southern Pacific) prior to 1945.[1] Beck purchased the property in 1985 in order to subdivide and develop it for residential purposes, but has been inhibited by the Department of Toxic Substances Control (the Department)[2] and the City due to the subsurface contamination. As a result of these inhibitions, Beck filed suit

[1]Southern Pacific is the surviving entity of a merger between the Southern Pacific and the Southern Pacific Company. Some of the early activities and/or conveyances described here were conducted by and in the name of the Southern Pacific Company. No issue is presented with respect to the defendant Southern Pacific's responsibility for the liabilities of the Southern Pacific Company.

[2]During the early stages of Beck's dealings with the state, the responsibility for the state's "Toxic Substances Control Program" was within the jurisdiction of the State Department of Health Services. Effective July 17, 1991, pursuant to the Governor's Reorganization Plan No. 1 of 1991, section 146, the Department was created and was vested with responsibility for the Toxic Substances Control Program. (Health & Saf. Code, §§ 58000, 58004.) Officers and employees of the Department of Health Services who were performing functions related to the Toxic Substances Control Program were transferred to the Department. (Health & Saf. Code, § 58006.) This reorganization had no practical effect on Beck since it continued to deal with the same state personnel as it had before. Further references in this opinion to the Department

against the Department, the City, Southern Pacific and others. Beck sought a series of declarations concerning its property, an extraordinary writ, general damages in the sum of $1,440,000 and other relief. In its cause of actions against the Department, Beck sought a peremptory writ of mandate commanding the Department "to exercise its discretion and determine whether [Beck's] real property is hazardous or nonhazardous property, and if hazardous, the appropriate mitigation measures or remedial action necessary to permit utilization of [Beck's] real property for residential purposes." As to the City, Beck sought an identical writ commanding the City to accept for filing, file, and process Beck's proffered tentative subdivision map. As to Southern Pacific, Beck sought a mandatory injunction requiring it to abate the nuisance by remediating the site and an award of incidental damages.

After bifurcated court trials, the following judgments were entered: (1) in favor of Beck and against the Department granting a writ of mandate compelling the Department to accord Beck a public hearing on whether its land should be designated hazardous waste property (Health & Saf. Code, § 25220 et seq. [hereafter undesignated section references are to the Health and Safety Code]); (2) in favor of the City and against Beck on Beck's claim that the City must accept and consider its application for approval of a tentative subdivision map; and (3) in favor of Beck and against Southern Pacific for abatement of a nuisance and incidental damages of $1,205,613.

We shall modify the judgment in favor of Beck against the Department and then affirm as modified. We shall reverse the judgment in favor of the City and against Beck and remand with directions to the trial court to grant declaratory relief in favor of Beck. Finally, we shall reverse the judgment in favor of Beck and against Southern Pacific and remand with directions to enter judgment in favor of Southern Pacific.

### FACTUAL AND PROCEDURAL BACKGROUND

The genesis of this litigation began in 1926. In that year Southern Pacific acquired a large block of real property, including the realty involved here. Around 1926, Southern Pacific constructed a large, oval-shaped, concrete oil reservoir on the property.

The reservoir was approximately 1,178 feet in length, 583 feet in width, and about 31 feet deep. It had an oil storage capacity of about 3 million

will refer to the Department of Health Services before July 17, 1991, and to the Department thereafter.

barrels.[3] It occupied about 16 acres and was constructed so that the bottom 8 feet were below surface level. In order to accomplish this, Southern Pacific excavated soil from the center and then used the soil to construct levees around the outside walls that protruded from the ground. The walls and floor were made from reinforced concrete approximately six inches thick. A roof was constructed over the reservoir which was supported by timbers and covered with silver tar paper. The reservoir was surrounded by eight towers with attached lightning rods. While the reservoir was in use, more than 3,000 barrels of unspecified fuel oil were applied to the levees for erosion control.

From about 1926 until 1945, Southern Pacific used the reservoir for storing "Bunker C" oil. Bunker C oil is a residual fraction of crude oil.[4] It remains within crude oil residue after the removal of lighter fractions such as naphtha gases, gasolines, jet fuels, kerosines, diesel fuels, and motor oils. Bunker oil is the last fraction that is removed before the crude oil residue consists of solids such as paraffins, waxes and asphalt. Since the refining process is designed to separate and remove lighter and more volatile fractions at each step, the residue after each step should contain fewer solvent chemicals that may give rise to health concerns. The process is not perfect, however, and lower fractions may still contain some potentially injurious constituents. Also as a result of the refining process, each fraction will be more viscous than earlier fractions. Bunker C oil, as one of the lowest fractions, is extremely viscous. In the record it was variously described with terms such as: molasses in January; thick and tar-like; gelatinous; and most commonly "gooey." In any event, Bunker C oil is relatively immobile and must be heated to a significant degree in order to be moved through a pipeline and prior to burning as fuel.

The Bunker C oil stored in the reservoir was used by Southern Pacific as fuel for its locomotives and, during World War II, by the United States Navy as fuel for its ships. By 1945 Southern Pacific had switched to diesel oil as locomotive fuel and it closed down its Bunker C oil reservoir. Although most of the Bunker C oil was removed from the reservoir, a small residue remained.

---

[3]The most widely used unit in the oil industry is the American barrel, which comprises about 42 U.S. gallons. (21 The New Encyclopaedia Britannica (15th ed. 1989) p. 439.) At different places in the record the 3 million capacity figure for the Southern Pacific reservoir is expressed as barrels or as gallons. The dimensions of the reservoir would support a 3 million barrel rather than a 3 million gallon estimate.

[4]Modern refining techniques are beyond the scope of our inquiry and, in any event, the Bunker C oil that was stored in the reservoir from 1926 until 1945 would not have been produced by the most recent technologies. For our purposes it is sufficient to note that at the time the most common crude oil refining process consisted of the use of heat to crack or split the large molecules of heavier oils so that lighter, more volatile and more valuable fractions could be separated and removed. (21 The New Encyclopaedia Britannica, *supra*, p. 439.)

In 1945, Southern Pacific sold the parcel of property which included the site of the reservoir to John Hachman for $4,500, excepting therefrom the mineral rights on or under the property. Hachman later acquired additional property from Southern Pacific so that, in all, he owned 72 acres surrounding the oil reservoir. Hachman dismantled the roof which covered the reservoir for the purpose of reselling the timber which, due to war rationing, was readily salable. After the dismantling was completed, the reservoir sat open and unused for a number of years. Although Hachman is deceased, his sons recalled that water accumulated in the bottom of the reservoir and the water level would rise in the summer during periods of agricultural irrigation and would drop in the winter. A small layer of oil floated on the top of the water in the tank.

In 1953 a fire started inside the reservoir. The fire was a noted event in the community at the time. It sent plumes of dark smoke into the air which were visible from miles away. The fire burned for a couple of days before burning itself out. Hachman's son, also named John Hachman, testified that it appeared the fire was consuming tumbleweeds, timber and tar. After the fire there was ash and water remaining in the reservoir with a small amount of residue near the pump station that appeared "dried up just the same as our stuff, that our streets are paved with." After the fire Hachman collapsed the walls of the reservoir into the center and bulldozed the soil from the levees back into place in order to bury the old reservoir about eight feet under the surface.

In 1956 or 1957, Hachman leased the 72-acre parcel to Mitsuo Kagehiro for farming purposes. There were some large blocks of concrete from the reservoir remaining on the surface of the land and Kagehiro moved them to the side of the property where they remained until after this litigation commenced. Kagehiro had heard about the old storage reservoir and knew there was concrete under parts of the land, but he never experienced any problems with the land and over the years forgot about the reservoir. In 1959 Kagehiro and his wife, Elsie, purchased the land from Hachman. Kagehiro farmed the property for the next 25 years.

By 1984 the City of Tracy was considered a prime location for residential development due to its proximity to the Bay Area. The City took certain steps to prepare for expansion, such as providing for streets, sewerage facilities and schools. It annexed and rezoned former agricultural properties, including the Kagehiro property, for residential development. Beck, a large, established real estate developer from the Stockton area, wanted to participate in the expansion and began looking for property to purchase. Eventually

Beck settled on the Kagehiro property, which it purchased from the Kagehiros for $25,000 per acre. The Kagehiros were not aware the old storage reservoir could be a problem, had forgotten about it, and did not tell Beck about it.

Around the same time another developer, known as Renown, purchased and developed property to the northeast of the Kagehiro tract. It turned out that the Renown tract had at one time been the site of a large oil storage facility owned by Standard Oil and that six smaller oil tanks belonging to Associated Pipelines had been located nearby. After development of the Renown property, the new residents began to experience problems related to the Standard Oil facility, such as oil rising to the surface of their yards. This caused members of the City's planning department to investigate the area and, upon viewing an old aerial photograph, they discovered the prior existence of the Southern Pacific reservoir on Beck's land.

The City advised Beck of the prior existence of the oil reservoir on its property. Beck hired American Environmental Management Corp. (American Environmental) to investigate. American Environmental conducted a preliminary investigation through which it confirmed the existence of the buried concrete reservoir and possible soil contamination, and it recommended a testing plan to resolve issues thus presented. Beck directed American Environmental to proceed with the testing plan.

In the meantime, Beck sought to expand its acreage for development. To this end, it purchased additional neighboring properties from Southern Pacific for a price of $17,000 to $18,000 per acre, and obtained a quitclaim deed from Southern Pacific for the mineral rights on the Kagehiro tract. Eventually Beck assembled a tract of approximately 107 acres which included the 72 acres it acquired from the Kagehiros with the 16 acres that overlie the buried reservoir.

In late 1986, American Environmental produced a report on its groundwater investigation. It had drilled three shallow groundwater monitoring wells outside and downgradient from the reservoir and had found no contamination.[5] American Environmental recommended quarterly monitoring of the groundwater for another year in order to take into account any seasonal changes in the groundwater.

---

[5] In the analyses performed with respect to the groundwater only one test indicated the presence of a chemical of concern. In one test toluene was indicated at a concentration of one part per billion (ppb). The standard for action applied by the Department and by the Regional Water Quality Control Board is 100 ppb. Since the presence of toluene was not indicated in any other test, some of the experts attributed the one indication to laboratory error. In any

In April 1987, the City advised Beck that before approving development of the property it would require that Beck obtain approvals from the Air Resources Board, the Solid Waste Management Board, the Regional Water Quality Control Board, and the San Joaquin County Department of Health. The San Joaquin County Department of Health advised Beck that it lacked the expertise to evaluate the property and suggested that it seek approval from the State Department of Health Services. This was acceptable to the City.

Of the various agencies whose approvals were required by the City, only one has prevented development of Beck's property and is at issue here, namely, the State Department of Health Services. Representatives of Beck met with personnel from the Department and were informed that Beck's property had such a low priority that it likely would not be evaluated for at least 10 and possibly 20 years. Beck was told that it could develop the property but that if problems were later discovered remedial action could be required which could include removal of structures. Assuming Beck would otherwise have proceeded in the face of this admonition, that was not an option because the City would not approve development without clearance from the Department.

About this time several changes occurred in the circumstances of Beck and its Tracy property. The Tracy Unified School District designated a portion of the property for acquisition and future use for high school purposes. The City commenced an action in eminent domain to acquire a portion of the property for utility purposes. And it appears that Beck, whose principals consisted of a father and two sons, was going through internal strife because one of the sons wished to split up the company. In view of these circumstances and in the process of division of the company, Beck decided to sell the property rather than develop it.

In early 1987 Beck reached a tentative agreement with a buyer known as the Jonathon Group for the sale of the property at a price of $48,000 per acre. But the agreement fell through when the Jonathon Group indicated that it did not wish to accept responsibility for the property that contained the old storage reservoir. In September 1987, Beck sold approximately 62 acres of its property to the Jonathon Group at a price of $55,000 an acre. Beck retained about 45 acres, including the property which contained the storage reservoir.

In the meantime American Environmental continued performing quarterly monitoring tests of the groundwater and filed reports advising that no

---

event, since that one indication was far below concentrations of regulatory concern, that test result did not become an issue.

detectable levels of contaminants were discovered. The Department hired Radian Corporation (Radian) to prepare a preliminary assessment. Radian reported that soil samples indicated soil contamination in the southern portion of the site. Radian viewed groundwater as the greatest potential exposure pathway but also viewed that pathway as minimal because the shallow groundwaters in the area are of poor quality and are not utilized through drinking water or municipal wells and, in any event, no groundwater contaminants were detected in the monitoring wells. Radian viewed soil contamination in the reservoir as a potential problem due to the possibility of excavation by and exposure to future residents.

In February 1988, Beck filed a formal application with the Department for a nonhazardous site designation. The Department advised that it did not have sufficient information and consequently discussions between Beck and the Department continued. In June 1988 the Department entered into a contract with Beck pursuant to which Beck would hire a consultant to perform an evaluation of the site and, for a fee of $39,700, the Department would provide review and oversight. The contract provided that when the Department deemed that adequate information had been presented by Beck or its consultant, it would, within 60 days, provide an evaluation whether the site posed any significant or potential hazard to human health or the environment. At various times Beck agreed to extend this contract and to pay additional moneys for departmental review and oversight.

Beck hired American Environmental to conduct a site characterization. American Environmental reported that tests on surface soils within the perimeter of the reservoir indicated the presence of a small quantity of hydrocarbons and recommended further testing. Soil bore samples from eight sites within the perimeter of the reservoir showed bottom depths of seven and one-half to nine feet, no contamination to a depth of five feet, and varying levels of oil contamination below five feet in each of the bore samples. When American Environmental attempted to sink a deep monitoring well outside and to the northwest of the reservoir, it encountered an area of oil saturation at the 12.5- to 15-foot level. American Environmental abandoned plans for a deep well in favor of soil borings. Two of five soil borings outside the perimeter of the reservoir showed oil contamination at the fifteen-foot depth. American Environmental believed this to be the result of the operation of a transfer pipeline in connection with the reservoir. American Environmental drilled a fourth shallow monitoring well and located it near to and downgradient from the area of soil saturation. No contaminants were detected in this or any of the three existing monitoring wells.

In April 1989, the Department refused to make a determination based upon American Environmental's work and report. The Department cited two concerns: the possibility of surface soil contamination by pesticides and heavy metals from agricultural practices, and the failure to establish a deep groundwater well.

In May 1989, Beck hired Kleinfelder, Inc. (Kleinfelder), to perform further testing and evaluation. Kleinfelder installed a deep monitoring well near the fourth shallow well that had been installed by American Environmental, and purged the four existing shallow monitoring wells. Sampling from the five monitoring wells failed to detect total petroleum hydrocarbon contamination. Kleinfelder also took surface soil samples from within and without the area of the reservoir and determined that heavy metal concentrations were consistent with native soils in the area.

In September 1989, the Department rejected the Kleinfelder report. The Department complained that the report was not prepared pursuant to a work plan approved by the Department. It noted that samples from the monitoring wells were tested for total petroleum hydrocarbons and asserted that testing should have been performed for aromatic volatile organics and polynuclear (or polycyclic) aromatic hydrocarbons (PAH's). And it said that a health risk assessment of all contaminants found at the site should be performed.

At this time Beck submitted a tentative subdivision map to the City but was advised that it would not be considered until the Department acted. Kleinfelder then prepared a work plan for performance of a health risk assessment and the Department approved the plan. The resulting report stated that groundwater testing had not detected the presence of aromatic volatile organics or PAH's and concluded that the risk associated with groundwater was negligible. Health risks associated with the surface soils were evaluated from the standpoint of a person who would live on property overlying the reservoir for a period of 70 years and were found to be below levels regarded as significant. Subsurface soils were evaluated from the standpoint of a construction worker installing a swimming pool who would be exposed to soils at the seven- or eight-foot level for eight hours a day for four weeks. Kleinfelder concluded that the lifetime cancer and noncancer risks to such a person were insignificant or negligible.[6]

After preparation of the risk assessment but before the Department had considered it, Beck reached an agreement to sell the City 4.8 acres of the

---

[6]In this respect the Department's primary concern was with the possibility of exposure to carcinogenic PAH's. There are sixteen types of PAH, of which nine are regarded as noncarcinogenic and seven are regarded as carcinogenic. The carcinogenic PAH's are regarded as group B carcinogens, that is, they are probable carcinogens based upon studies with animals but with limited or inadequate evidence from human studies. The seven carcinogenic

property for an extension of Schulte Road and a drainage channel. The City paid Beck $368,425 for this portion of the property. The extension of Schulte Road and the drainage channel traverse the portion of the property that overlies the buried reservoir.

In December 1990, the Department responded to Kleinfelder's health risk assessment. It appeared satisfied with the assessment with respect to heavy metals and pesticides in the surface soils. But it complained of the failure to conduct additional groundwater testing for PAH's and aromatic volatile organics. It noted that testing had been concentrated in areas overlying the reservoir and suggested that contamination could be present in other areas. Finally, the Department disagreed with Kleinfelder's analysis of the health risks posed by the subsurface soils. In the Department's view, the appropriate methodology would be to assume that the subsurface soils were in fact on the surface, and to calculate the health risk to a 70-year resident from the undetected PAH's that it required Kleinfelder to assume were present. The Department's methodology produced a significantly increased health risk from the soils at the seven- or eight-foot depth.[7]

In June 1991, the Department clarified its response to the Kleinfelder health risk assessment. It concluded that the land lying outside the perimeter of the oil reservoir poses no threat under any identified land use and that residential development of that portion of Beck's land should be permitted, provided that anyone undertaking development be prepared to mitigate any

PAH's have widely disparate potency factors. In the subsurface soil testing from the Beck property, two tests detected noncarcinogenic PAH's but no carcinogenic PAH's were detected. However, testing protocols have detection limits which are influenced by the matrix in which suspected chemicals may exist. The lowest carcinogenic PAH detection limit achieved on the Beck soil samples was 200 ppb, meaning PAH's could be present at levels below that without being detected in the testing. In the health risk assessment the Department required Kleinfelder to assume the existence of each of the seven carcinogenic PAH's at levels of one-half the detection limit, or one hundred ppb each. The Department also required the use of the potency factor of the worst of the carcinogenic PAH's for all of the seven carcinogenic PAH's.

[7]Health risks associated with PAH's are defined in terms of projected cancer rates determined through the use of potency factors applied to concentrations, assumed length of exposure, and other data. The resulting risks are expressed by reference to exponents of 10; for example, a risk of 1 cancer in 10,000 persons exposed (.0001) would be expressed by the designation $1 \times 10^{-4}$, while 1 in 100,000 (.00001) would be expressed as $1 \times 10^{-5}$. Department personnel testified that risk values in the $10^{-6}$ range would be regarded as insignificant while values in the $10^{-5}$ range would call for the exercise of regulatory judgment. The risks calculated for a pool construction worker under the Kleinfelder scenario were much lower than the $10^{-6}$ level. In contrast, the Department's calculation for a 70-year resident, on surface soils containing 100 ppb of each of the carcinogenic PAH's, utilizing the potency factor of the worst PAH, resulted in a risk factor of 1 to $3 \times 10^{-5}$.

condition discovered during development. The Department expressed continuing concern with the land overlying the reservoir but said that development could proceed if: (1) uncertainty regarding carcinogenic PAH's is resolved by additional testing;[8] (2) the soil immediately above the reservoir is remediated by excavation and treatment; or (3) use restrictions are placed on the property.[9]

Shortly after the clarification letter, the Tracy Unified School District obtained an order condemning a portion of Beck's remaining property. Through this order the school district obtained approximately 14.9 acres of the property and paid approximately $122,000 per acre to Beck. The school district's property abuts the Schulte Road extension and overlies the northern portion of the buried reservoir. This left Beck with approximately 26 acres of which approximately 6 acres overlie the reservoir.

Kleinfelder continued testing by using a backhoe to obtain four soil samples from depths where the soils contacted the reservoir floor. These samples were tested for PAH's with negative results. A sample from the deep monitoring well was tested for PAH's and semivolatile organics with negative results. In July 1991, Klienfelder submitted a report concluding that lifetime cancer risks were negligible and below levels of regulatory concern.

In the meantime Beck, through its attorney, took the position that the Department's imposition of conditions for development represented a determination that the property is a hazardous waste property and Beck demanded a hearing pursuant to section 25222. The Department responded by sending a letter to the City advising that there may be a significant health risk if the property overlying the reservoir is developed for residential use and recommending that the City impose a moratorium on the construction of single-family residences and on the construction of multiple-family residences until the soil is remediated or additional testing and improved analytical techniques establish that PAH's do not pose a significant risk.

Klienfelder continued its work on the property. With the participation of a representative of the Department, it used a backhoe to dig five trenches from

---

[8]As we have noted, carcinogenic PAH's have not been detected in association with the Beck property. However, the lowest detection level achieved in the testing was 200 ppb, and thus the testing could not exclude the possibility that PAH's were present at levels below that. The Department's suggestion was that Beck's consultants lower their detection limits, although at trial no one from the Department seemed to know whether that could be accomplished or, if so, how it might be done.

[9]The use restrictions suggested by the Department would prohibit development of the property overlying the reservoir for single-family residences but would allow multiple-unit dwellings such as duplexes, etc. Since the Department's calculations were based upon an assumption of a 70-year residency, it was reasoned that multiple-unit dwellings would reduce the likelihood of long-term tenancy and potential exposure to PAH's that might be present.

which nine samples were obtained from the five- to eight-foot and depth. These samples, except sample No. 67916, were subjected to testing were included in a health risk assessment. That assessment concluded that the cancer risk from the soils ranged from zero if the soil remained under the surface to the $10^{-6}$ range if the soil were brought to the surface and an individual remained on the property for 30 years as a child and adult.[10]

Sample No. 67916 was a chunk of thick, tarry, fibrous material discovered on the floor of the reservoir. It resembled a roofing shingle but was much thicker, about two inches in depth. A roofing nail discovered embedded in the sample led to speculation that it may have been roofing material dropped into the reservoir when the roof was dismantled and melded by the subsequent fire. The Department took the position that no determination could be made with respect to the Beck property without an analysis of sample No. 67916. Kleinfelder submitted an addendum to its earlier report in which it concluded that risk levels associated with sample No. 67916 were negligible. The Department disagreed with that assessment, but noted that the material in sample No. 67916 appeared only as a thin layer on the concrete floor of the reservoir and could be removed before development. The Department also concluded that PAH's would be present within the reservoir but not at levels which would pose health risks.

While these events were occurring, the City was proceeding with its plans to build a road and drainage ditch across the property overlying the reservoir. To this end the City hired consultants, including Harding-Lawson Associates, to perform a site analysis. Harding-Lawson Associates found detectable levels of oil and grease in excavated soils along the proposed route for the road and ditch. It recommended that soils removed from the site during construction be isolated for proper disposal and that the drainage ditch be lined. The City hired SCS Engineers to determine whether the soils at the construction site were hazardous and based upon SCS Engineers' work, the City sent the Department a self-certification letter declaring that the soils from the site were nonhazardous. The Department responded that although the soils were nonhazardous, the elevated oil and grease levels might require remediation which would be regulated by the Regional Water Quality Control Board or the San Joaquin County Department of Health.

During the construction of Schulte Road and the drainage ditch over the buried reservoir, the City excavated a pit in which it encountered a layer of

---

[10]These calculations utilize Environmental Protection Agency (EPA) ingestion rates. These rates assume that people ingest surface soils and their constituent materials at a constant daily intake rate. The use of such ingestion rates over periods of exposure can indicate the probable exposure to materials known or assumed to be in the surface soils. The EPA ingestion rate for children is double the ingestion rate for adults and accordingly a health risk assessment must distinguish between periods of exposure as a child and as an adult.

oil saturation at a depth of about 16 feet. The layer of oil contamination was about four feet below broken concrete pieces that appeared to be part of the reservoir. It consisted of a three-inch layer lying above a layer of silty clay and below a layer of light, sandy soil.

SCS Engineers was directed to prepare a risk assessment. It took samples of the contaminated soil, which were found to be nontoxic and nonhazardous. The risk to human or animal life from the material was found to be negligible. The potential for migration of the material in the ground was found to be minimal due to its extremely viscous nature. SCS Engineers recommended that the pit be filled with stone and clean soil and that the drainage ditch be lined. The City proceeded as recommended under the supervision of the Regional Water Quality Control Board.

While all this was happening, Beck was proceeding with litigation against various parties involved with the land. In June 1987 it filed a complaint against Southern Pacific and others. In July 1990 Beck amended its complaint to add causes of action against the Department and the City. All of the claims of the parties and issues which became involved in this litigation through the complaint, amended complaints, and various cross-complaints, were resolved prior to trial with the exception of Beck's cause of action against Southern Pacific for nuisance and its causes of action against the Department and the City. As to Southern Pacific, Beck sought an injunction requiring it to abate the nuisance by remediating the site and an award of incidental damages. As to the Department, Beck sought an order requiring that it be accorded a statutory hearing on the status of its property or, in the alternative, specific performance of its agreement to make a determination with respect to the site. As to the City, Beck sought declaratory relief providing that the City must accept and consider its application for approval of its subdivision map. The cause of action against Southern Pacific and the causes of action against the governmental entities were severed for separate trials.

The causes of action against the governmental entities were tried before Judge Garrigan. The court held that the Department must accord Beck a noticed public hearing on whether the property is or is not a hazardous waste site. It held that Beck is not presently entitled to a judicial determination on that question but will be entitled to judicial review of the decision reached after the public hearing. The court denied relief against the City.

The cause of action against Southern Pacific was tried before Judge Callahan. The court held that the site constitutes a continuing public nuisance. It ordered Southern Pacific to determine and define the lateral and

vertical extent of petroleum hydrocarbon contamination of the soil and groundwater of the site. It further ordered Southern Pacific to remediate the contamination pursuant to standards of the Department, the Regional Water Quality Control Board, and the City, so that the property may be developed as a single-family residence subdivision. The court awarded Beck $1,205,613.18 as damages for special injury from the existence of the public nuisance. The court retained jurisdiction to enforce its judgment and to award additional damages to Beck to the date of remediation.

We consolidated the appeals generated by these judgments. In this consolidated appeal we are concerned with an appeal by the Department from the judgment in favor of Beck; a cross-appeal by Beck with respect to that judgment; an appeal by Beck from the judgment in favor of the City; and an appeal by Southern Pacific from the judgment in favor of Beck. We consider each of these appeals and cross-appeals separately.

DISCUSSION

I. *Beck v. The Department*

A. *The Department's Appeal*

In its judgment on the causes of action by Beck against the Department, the court determined that Beck was not entitled to specific performance of its contract with the Department but was entitled to a noticed public hearing pursuant to section 25220 et seq. The Department raises a single issue in its appeal. It contends that its decisions under section 25221.1 are purely discretionary and consequently the court cannot mandate it to hold a hearing. In the Department's view, in ordering a hearing "the court usurped [its] judicial function, acting in a legislative capacity to alter the duties and responsibilities set forth in the Health and Safety Code." Beck counters that section 25221.1 imposes mandatory duties on the Department which are enforceable by mandate. We hold that the trial court properly issued its writ of mandate.

Chapter 6.5 of division 20 of the Health and Safety Code constitutes the Legislature's exercise of the state's police power with respect to hazardous waste control. Chapter 6.5 was originally enacted in modest form in 1972. (Stats. 1972, ch. 1236, § 1, pp. 2387-2393.) Through the years it has been considerably expanded and now represents a lengthy statutory scheme for the control of hazardous wastes. For the most part the provisions of chapter 6.5 are prospective in nature, dealing with such things as the storage, transportation, treatment and disposal of hazardous wastes and the regulation

of persons, businesses, and facilities involved with hazardous wastes. The alleged contamination of Beck's property occurred through a land use which was terminated more than 40 years before any dispute arose and long before the enactment of chapter 6.5. Accordingly, our focus here is narrowed to issues concerning the effect the prior land use may have on Beck's current land use plans. The statutory provisions governing these issues are contained in article 11 of chapter 6.5 (article 11), entitled "Hazardous Waste Disposal Land Use."

Article 11 is concerned with property that may be found to be "hazardous waste property."[11] Section 25117 defines a hazardous waste, in relevant part, as: "A waste or combination of wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may either: [¶] (A) Cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness. [¶] (B) Pose a substantial present or potential hazard to human health or environment when improperly treated, stored, transported, or disposed of, or otherwise managed."[12] A hazardous waste property is defined in section 25117.3, subdivision (a), as "land which is either of the following: [¶] (1) Any hazardous waste facility or portion thereof, required to be permitted pursuant to this chapter, which has a permit for disposal from the department or has submitted an application for such permit. [¶] (2) A portion of any land designated as a hazardous waste property pursuant to Section 25229 where a significant disposal of hazardous waste has occurred on, under, or into the land resulting in a significant existing or potential hazard to present or future public health or safety."

The basic mechanism in article 11 for the protection of the public from the dangers posed by hazardous waste property is found in land use restrictions to be recorded in the chain of title with respect to such property. (§§ 25220, subd. (d), 25222.1, 25229, subd. (b), 25230, 25235.) If use restrictions are imposed, then a new contrary use of the land will not be permitted unless the person proposing such use follows procedures for obtaining a variance or for

---

[11]Article 11 also governs property that may be found to be "border zone property" by virtue of its proximity to a location of significant hazardous waste disposal. (§ 25117.4.) There is no suggestion that Beck's property is or may be border zone property and we need not refer further to statutory provisions with respect to border zone property.

[12]Section 25117, subdivision (a)(2), also defines a hazardous waste as a waste that meets criteria adopted by the Department pursuant to section 25141 for the identification of hazardous waste. Section 25117, subdivision (b), further states that the term hazardous waste includes, but is not limited to, RCRA hazardous waste. RCRA stands for the federal Resource Conservation and Recovery Act of 1976. (42 U.S.C. § 6901 et seq.; 40 C.F.R. § 261.2 et seq. (1995).) It was conceded that the RCRA is not involved in the issues presented with respect to Beck's property.

removing the designation of the land as a hazardous waste property. (§§ 25232, 25233, 25234.)

Unless a landowner and the Department agree to the imposition of land use restrictions, such restrictions may be imposed only through a decision by the director after a noticed public hearing conducted in compliance with procedures set forth in article 11 and, so far as practicable, in accordance with the Administrative Procedures Act. (§§ 25222.1, 25223-25229; Gov. Code, § 11500 et seq.) In this respect article 11 clearly distinguishes between the role of the Department and the role of the director. The Department is assigned the role of obtaining, analyzing, and evaluating information, after which it may make a "determination" whether the land should be designated as hazardous waste property.[13] (§ 25220, subd. (a)(1).) The director is assigned the role of making a "designation" of the land as hazardous waste property, which may be done only after a determination by the Department and a noticed public hearing.[14] (§ 25220, subd. (a)(2).) Thus, a determination by the Department that particular land should be designated as hazardous waste property serves the function of an administrative complaint that commences the hearing process. At the hearing, the Department bears "the burden of proving that hazardous waste has been deposited on, under, or in the land and that the hazardous waste creates a significant existing or potential hazard to present or future public health or safety on the hazardous waste property." (§ 25228, subd. (a).)

Whether particular property should be designated as hazardous waste property may come under consideration by the Department in three ways. First, such an inquiry may be instigated by the Department whenever it has reasonable cause to believe that the land may be a hazardous waste property. (§ 25220, subd. (b).) In such an instance, the Department may request pertinent information from any person who owns, leases or occupies the land, or who has information relating to the land. (§ 25220, subd. (b).) Second, such an inquiry may be instigated by any person who is the owner, lessor, or lessee of the land. (§ 25221, subds. (a) & (b).) Such a person may apply for a determination when he or she knows or has reasonable cause to believe that the land may be a hazardous waste property, and must apply for a determination when he or she knows or has reasonable cause to believe a

---

[13]A "determination" is statutorily defined to mean "a decision by the department as to whether land should be designated as hazardous waste property or border zone property and which is reached after an analysis and an evaluation of the information obtained by the department." (§ 25220, subd. (a)(1).)

[14]A "designation" is defined as the "imposition of the requirements specified in Section 25230 after a determination, a public hearing, and a decision by the director has occurred pursuant to Section 25229." (§ 25220, subd. (a)(2).)

significant disposal of hazardous waste has occurred on, under, or into the land and he or she intends, within one year, to construct or allow the construction of a building or structure that will be used for a purpose for which use restrictions may be imposed. (§ 25221, subds. (a) & (b).) Third, a city or county that has probable cause to believe that any land within its jurisdiction is a hazardous waste property may apply to the Department for a determination. (§ 25221, subd. (c).)

Of particular significance here is section 25221.1, which lists the five options open to the Department after it receives an application. Section 25221.1 provides: "Whenever the department receives an application pursuant to Section 25221, it may request information pursuant to Section 25220 to determine whether the land should be designated as hazardous waste property or border zone property. Upon evaluating all pertinent available information, the department may do any one or more of the following: [¶] (a) Issue a statement that, based on existing documents and other information available to the department, there is no currently known hazard. [¶] (b) Recommend to local land use authorities that they place a moratorium on any new land uses specified in paragraph (1) of subdivision (a) of Section 25232, if the department suspects that the land is hazardous waste property, or a moratorium on the construction or placement of any building or structure which is intended to be used for any of the purposes specified in paragraph (1) of subdivision (b) of Section 25232, if the department suspects that the land is border zone property. [¶] (c) Collect additional information, including sampling, monitoring, and analytical data for the purpose of making a determination as to whether the land should be designated as hazardous waste property or border zone property pursuant to Section 25229. [¶] (d) Make a determination as to whether the land should be designated as hazardous waste property or border zone property pursuant to section 25229. [¶] (e) Enter into an agreement pursuant to Section 25222.1 [for the imposition of use restrictions with the consent of the owner]."

As we have noted, in this case, Beck contemplated developing its property for single-family residence purposes and, upon learning of the prior existence of the oil reservoir, filed an application with the Department for a determination whether the property should be designated a hazardous waste property. When the Department informed Beck that it would not consider its property in the indefinite future, Beck entered into a contract with the Department whereby it would pay the Department to provide oversight and review and Beck would hire consultants to investigate and evaluate to the end of obtaining a determination. Over the next several years Beck was unable to satisfy the Department and eventually the Department suggested

further testing, remediation, or the placement of use restrictions on the property. Beck took this suggestion as a determination and demanded a hearing. However, the Department declined to consider this to be a determination and refused to accord Beck a hearing. Instead, the Department advised the City to impose a moratorium on Beck's proposed development of the property. The Department then purported to wash its hands of the matter and refused to take further action. The Department maintains that it could do this by virtue of the provision in section 25221.1 that provides that the Department "may do any one or more" of the five listed actions. The Department maintains that the choice of which, if any, of the listed actions to take is discretionary and cannot be controlled by the courts through mandate.

Although it is true that section 25221.1 states that the Department may take any one or more of five actions, the moratorium option, as permitted in subdivision (b), is inconsistent with finality. "Moratorium" is defined as: "[A] legally authorized period of delay in the performance of a legal obligation or the payment of a debt . . . [;] waiting period set by some authority: a delay officially required or granted . . . [;] a suspension of activity: a temporary ban on the use or production of something . . . ." (Webster's Third New Internat. Dict. (1971) p. 1469; accord, see Black's Law Dict. (6th ed. 1990) p. 1009; Ballentine's Law Dict. (3d ed. 1969) p. 815; 58 C.J.S. (1948) p. 1208; see also Ins. Code, §§ 1044, 12620.) A moratorium is by its nature an interim or temporary measure which contemplates future resolution or performance of issues and matters held temporarily in abeyance. The essentially interim or temporary nature of a moratorium is contrary to the Department's position that section 25221.1 permits it to elect a moratorium as an end in itself.

In determining whether section 25221.1 permits the Department *to utilize* a moratorium as a temporary measure or as an end in itself, we are constrained to conclude that the moratorium option in subdivision (b) can be construed to be only a temporary measure in aid of the Department's role in making a determination with respect to particular property. To conclude otherwise would violate fundamental principles of due process of law. We deal here with an exercise of the state's police power. While the police power is broad, its exercise cannot be divorced from the requirements of procedural due process. (*Wisconsin* v. *Constantineau* (1971) 400 U.S. 433, 436 [27 L.Ed.2d 515, 518, 91 S.Ct. 507].) "It is significant that most of the provisions of the Bill of Rights are procedural, for it is procedure that marks much of the difference between rule by law and rule by fiat." (*Ibid.*) "Under its police power to protect public health and safety [the state] may destroy private property without liability to the property owner, but when it does this

it must afford the owner due process of law." (*Friedman* v. *City of Los Angeles* (1975) 52 Cal.App.3d 317, 321 [125 Cal.Rptr. 93].)[15]

 In considering the applicability of due process principles, we must distinguish between actions that are legislative in character and actions that are adjudicatory. In the case of an administrative agency, the terms "quasi-legislative" and "quasi-judicial" are used to denote these differing types of action. Quasi-legislative acts involve the adoption of rules of general application on the basis of broad public policy, while quasi-judicial acts involve the determination and application of facts peculiar to an individual case. (*Horn* v. *County of Ventura* (1979) 24 Cal.3d 605, 613 [156 Cal.Rptr. 718, 596 P.2d 1134]; *People* v. *Lockheed Shipbuilding & Constr.* Co. (1973) 35 Cal.App.3d 776, 781 [111 Cal.Rptr. 106].) Quasi-legislative acts are not subject to procedural due process requirements while those requirements apply to quasi-judicial acts regardless of the guise they may take. (*Horn* v. *County of Ventura, supra,* 24 Cal.3d at p. 612; *People* v. *Lockheed Shipbuilding & Constr. Co., supra,* 35 Cal.App.3d at p. 781.) When a quasi-judicial action is to be taken, procedures must be available to provide, at a minimum, notice and an opportunity for a hearing. (*Menefee & Son* v. *Department of Food & Agriculture* (1988) 199 Cal.App.3d 774, 781 [245 Cal.Rptr. 166]; *Friedman* v. *City of Los Angeles, supra,* 52 Cal.App.3d at p. 321.) The Department's attempt to restrict the use of Beck's property based upon facts peculiar to that property is unquestionably quasi-judicial in nature and must comport with requirements of due process.

The moratorium option, if construed as an end in itself as urged by the Department, would be glaringly deficient when measured against due process standards. In essence, due process principles are intended to guarantee a fundamentally fair decisionmaking process. (*People* v. *Ramos*

---

[15]We do not deal here with an alleged governmental taking of private property without compensation. The statutory scheme at issue is not part of the state's regulatory scheme for the development and use of land but is intended to protect the public's health and safety. (§§ 25100, 25101.) The restrictions that may be imposed do not preclude the owner from making any economically valuable use of the land but are intended to prevent only such uses as will present a hazard to health and safety. (§ 25232.) And the Legislature has declared: "Any hazardous waste easement, covenant, restriction, or servitude, or any combination thereof, as appropriate, executed pursuant to this section shall be exclusively for the purpose of protecting the public health and safety and shall convey no interest in real or other property to the state." (§ 25230, subd. (c).) Under these circumstances it is clear that we are concerned with the exercise of the police power and not with a governmental taking of property. (See *Lucas* v. *South Carolina Coastal Council* (1992) 505 U.S. 1003 [120 L.Ed.2d 798, 820-821, 112 S.Ct. 2886]; *Tahoe Keys Property Owners' Assn.* v. *State Water Resources Control Bd.* (1994) 23 Cal.App.4th 1459, 1476, fn. 14 [28 Cal.Rptr.2d 734].) Beck does not suggest otherwise.

(1984) 37 Cal.3d 136, 153 [207 Cal.Rptr. 800, 689 P.2d 430]; *Menefee & Son* v. *Department of Food & Agriculture, supra,* 199 Cal.App.3d at p. 781.) At a minimum, due process requires notice and an opportunity for a hearing, and the other safeguards that may be required vary with the circumstances. (*Kash Enterprises, Inc.* v. *City of Los Angeles* (1977) 19 Cal.3d 294, 307 [138 Cal.Rptr. 53, 562 P.2d 1302]; *Menefee & Son* v. *Department of Food & Agriculture, supra,* 199 Cal.App.3d at p. 781.) ▉ But the moratorium option in section 25221.1 provides no safeguards. It may be imposed on a mere suspicion. It makes no provision for such things as notice, the right to be heard, evaluation by an impartial decision maker, or review. In short, the moratorium option, if construed as an end result of the Department's participation, wholly fails to comport with due process principles.

It is no answer to assert, as the Department does, that the Department only recommends a moratorium and it is up to the local land use authority to actually impose a moratorium. First, it is certain that the Legislature intended local land use authorities to pay heed to the Department's recommendation for a moratorium. Second, even if in a particular case the local land use authority rejected such a recommendation, the land would still be disparaged by the Department's pronouncement. In either case the landowner's ability to sell or make use of the land would be inhibited. In *Wisconsin* v. *Constantineau, supra,* 400 U.S. at pages 436 and 437 [27 L.Ed.2d at pages 518-519], it was held that a person's interest in her good name, reputation, honor, or integrity was sufficient to invoke due process requirements before the government could pin an unsavory label upon her. Beck has a sufficient, legally recognized and protected interest in its property and business to warrant similar due process protection. (See *Ramon Manor Convalescent Hospital* v. *Care Enterprises* (1986) 177 Cal.App.3d 1120, 1130-1131 [225 Cal.Rptr. 120]; *Polygram Records, Inc.* v. *Superior Court* (1985) 170 Cal.App.3d 543, 549 [216 Cal.Rptr. 252]; *Lowell* v. *Mother's Cake & Cookie Co.* (1978) 79 Cal.App.3d 13, 17 [144 Cal.Rptr. 664, 6 A.L.R.4th 184].)

In addition, the argument advanced by the Department is contrary to long-standing authority. In *Joint Anti-Facist Refugee Committee* v. *McGrath* (1950) 341 U.S. 123 [95 L.Ed. 817, 71 S.Ct. 624], associations included in a list of alleged subversive organizations disseminated by the Attorney General complained of their inclusion in the list without an opportunity for a hearing. Although the justices agreed on little else, the majority held that the associations were entitled to due process with respect to their inclusion on the list regardless whether inclusion imposed any direct demands upon them. (See also *Bantam Books* v. *Sullivan* (1963) 372 U.S. 58 [9 L.Ed.2d 584, 83 S.Ct. 631].) In *Endler* v. *Schutzbank* (1968) 68 Cal.2d 162 [65 Cal.Rptr. 297,

436 P.2d 297], the Commissioner of Corporations, while refusing to accord the plaintiff a hearing on untested charges, embarked on a course of conduct intended to dissuade employers from employing the plaintiff. The commissioner made the same argument that the Department makes here: that he merely offered advice and that the actual decision whether to employ the plaintiff was left to the prospective employers. ■ The Supreme Court found the proposition to be settled that "whenever governmental action based upon a stigmatizing judgment injures an individual by inducing others not to deal with him, he may challenge in court the government's refusal to accord him a full hearing on the disputed facts which form the basis of its action." (*Id.* at p. 178.)

■ The due process deficiencies we have been discussing are all the more conspicuous when the moratorium option is viewed in light of all of the provisions of article 11. There the Legislature made careful provision for a full panoply of due process safeguards before property is designated hazardous waste property. Thus, in addition to adopting, insofar as practicable, the procedures of the Administrative Procedures Act, article 11 includes specific provisions applicable to designation hearings intended to ensure that affected persons have notice, an opportunity to present evidence, a written decision by the director with the Department bearing the burden of proof, and judicial review by administrative mandate. (§§ 25222-25231.) If, after a hearing, property should be designated hazardous waste property and use restrictions are imposed, then article 11 includes provisions by which affected persons can apply later for a variance or for removal of the designation. (§§ 25232-25234.) In contrast to these provisions, the moratorium option, as construed by the Department, effectively restricts the use of the land for the indefinite future upon a mere suspicion and without any procedural safeguards. It would be anomalous to conclude that while carefully incorporating due process safeguards into the use restrictions that result from a hazardous waste designation, the Legislature intended that the Department could indefinitely preclude the use of property without any procedural safeguards through the imposition of a temporally indefinite moratorium.[16]

Finally, the Department's interpretation of the moratorium option cannot stand in light of the legal requirements imposed on local agencies with

---

[16]Section 25221.1, including the moratorium option, was enacted in Statutes 1984, chapter 1736, section 8, at pages 6312 and 6313. That act was introduced as Assembly Bill No. 3879 (1983-1984 Reg. Sess.), at the request of the Department. Beck has requested that we take judicial notice of legislative materials generated during the legislative consideration of Assembly Bill No. 3879, which include a request for approval of the measure from the Department in which the Department stated that in the event of a recommendation for a local moratorium, "the Department would also proceed with a determination that might result in a designation and land use restriction." Beck has provided certified copies of these materials

respect to land use. As we shall explain in our discussion of Beck's cause of action against the City, local agencies have the legal authority to impose a development moratorium, but only on an interim basis and only after compliance with certain procedural safeguards. (See Gov. Code, § 65858.) Such a measure may be employed for the purpose of permitting investigation of the need for formal amendment of the local agency's general or specific plans or zoning ordinances. (Gov. Code, § 65868.) It would border on the absurd to conclude that the Legislature gave the Department the authority to recommend that a local agency impose such a moratorium, but did not intend to require the Department to proceed with further consideration of the circumstances that would support the imposition of such an urgent, interim measure.

In view of these factors, we reject the Department's contention that the moratorium option in section 25221.1, subdivision (b), is a final action which may be taken by the Department exclusive of any other action. To so construe the statute would be inconsistent with the concept of a moratorium, would violate fundamental principles of due process, would be inconsistent with the Legislature's clear intent to provide affected landowners with full due process safeguards before their use of their property is restricted by a hazardous waste designation, and would put local agencies in the position of being advised to impose interim urgency measures for no apparent purpose. We hold, therefore, that the moratorium option is an interim measure to preserve the status quo pending a prompt investigation and determination by the Department.[17]

It remains to be determined whether mandate is a proper remedy under these circumstances. We conclude that it is. In doing so, we reject the Department's contention that mandate cannot lie because it is not required to do anything by the terms of article 11. In the Department's view, upon

---

and has given notice of its request for judicial notice to the Department. (See Evid. Code, § 453.) We will grant the motion for judicial notice. However, we note that these materials serve only to reinforce our view of the appropriate interpretation of the moratorium option.

[17]The moratorium option, construed as an interim measure, serves the state's legitimate interest in preserving the status quo as an adjunct of the ability to render an effective decision. (See *Chrysler Credit Corp.* v. *Waegele* (1972) 29 Cal.App.3d 681, 687 [105 Cal.Rptr. 914].) And the potential exposure of the public to contamination is recognized as an emergency situation that may warrant summary action by the state. (See *Carrera* v. *Bertaini* (1976) 63 Cal.App.3d 721, 728 [134 Cal.Rptr. 14].) But these factors do not serve to eliminate the requirement that a landowner be accorded due process of law. (*Kash Enterprises, Inc.* v. *City of Los Angeles*, *supra*, 19 Cal.3d at p. 308; *Brooks* v. *Small Claims Court* (1973) 8 Cal.3d 661, 667-668 [105 Cal.Rptr. 785, 504 P.2d 1249].) However, as an interim measure the moratorium option dovetails with the local agency's authority to impose a moratorium to accord a landowner procedural safeguards and to ensure a reasonably prompt resolution of the questions concerning the property.

receiving an application for a hazardous waste determination it may take any of the five actions set forth in section 25221.1, or it may do nothing at all. The Department argues that since it may do nothing at all, mandate cannot be issued to compel it to take any of the actions set forth in section 25221.1.

In article 11, the Legislature has created a scheme by which certain persons and local governments may apply for a hazardous waste determination and certain other persons, including those in Beck's position, are required to make such an application. (§ 25221.) It would seem anomalous to argue that the Legislature intended that the Department could totally ignore the applications it thus receives. But anomaly aside, we need not determine whether in some cases the Department may do nothing, for in this case that ship has long since sailed. After receiving Beck's application, the Department undertook, and imposed upon Beck the expenses of, a lengthy investigation of the property. Eventually the Department attempted to restrict Beck's use and development of the property by recommending a moratorium. The imposition of a moratorium, whether temporary or not, is a sufficient interference with Beck's property interests to entitle it to due process protection, which includes the right to an adjudicatory hearing. (*Kash Enterprises, Inc.* v. *City of Los Angeles, supra,* 19 Cal.3d at p. 308.) Having progressed this far, it is too late for the Department to fall back on its claim that it could have done nothing.

A petition for a writ of mandate is an appropriate remedy for compelling an administrative agency to provide a fair hearing where one has been refused. (See *Vollstedt* v. *City of Stockton* (1990) 220 Cal.App.3d 265, 269 [269 Cal.Rptr. 404]; *Forrest* v. *Trustees of Cal. State University & Colleges* (1984) 160 Cal.App.3d 357, 359-360 [206 Cal.Rptr. 595].) We agree with the trial court that Beck is entitled to a determination by the Department and that mandate should be issued to compel the Department to make such a determination. In one respect, however, we find the judgment to be too narrow. In essence, the trial court's decision treats the Department's recommendation for a moratorium as a determination that the property should be designated as hazardous waste property, thus triggering the right to the hearing procedures set forth in the code. In fact, the problem here is that the Department has refused to make a determination, and has instead attempted to restrict the use of Beck's property through the moratorium option.[18] The determination the Department must make is whether to issue a statement that

---

[18]Under article 11, a "determination" is a term of art which signifies an official and somewhat formal decision by the Department as to whether land should be designated hazardous waste property. (§ 25220, subd. (a)(1).) Such a determination triggers the right to a designation hearing and the procedural safeguards incorporated therein. (§§ 25220, subd. (b), 25221.1, subd. (d).) Under these circumstances, the views of some of the Department's

there is no currently known hazard or to pursue use restrictions through designation hearing procedures. (§ 25221.1, subds. (a) & (d).) The choice of which course of action to take is a matter committed to the Department. Accordingly, the judgment granting a writ of mandate should compel the Department to make a reasonably prompt determination, and then to either issue a no-known-hazard statement or proceed with hearing procedures, as required by the determination it makes. We shall modify the judgment in this respect and then affirm the judgment as modified.

## B. *Beck's Cross-appeal*

■ In its cross-appeal, Beck asserts that it is entitled to specific performance of its agreement with the Department. In the agreement by which Beck agreed to pay the Department to provide review and oversight, it was provided that "[w]hen the department deems that adequate information has been presented by Beck or its consultant concerning the Site, the department shall, within sixty (60) days, provide Beck, the City of Tracy, the Tracy Unified School District and the San Joaquin Local Health District with an evaluation as to whether the site poses any significant or potential hazard to human health or the environment."

Although Beck sought specific performance of this agreement, the particular form of the relief it was demanding was less than clear. The trial court took Beck's claim as an effort to obtain an order that the Department provide a particular, and favorable, determination on its application. The court concluded that Beck is not, and never could be, entitled to control the Department's determination through contract.

On appeal Beck points to a letter it received from the Department's Region One chief, James T. Allen, in which Allen indicated that under the agreement the Department would make a determination whether significant risks to the public or the environment would be associated with Beck's intended uses and, if so, would recommend mitigation measures that would permit the proposed use. Beck asserts that, among other things, the Department has failed to propose mitigation measures.

To the extent that Beck's cause of action for specific performance may be construed as an effort to obtain a particular determination from the Department, we agree with the trial court that such relief would be improper. The

---

personnel that the recommendation for a moratorium was a determination cannot substitute for the official departmental decision that constitutes a determination under article 11. Accordingly, we reject Beck's suggestion that testimony of some of the Department's personnel compels a finding that a determination has been made. We note, however, that this conclusion is not unfavorable to Beck, since it merely preserves for the Department the option of issuing a no-known-hazard letter rather than proceeding with the hearing procedures that are otherwise required.

Department's duties under article 11 are an exercise of the police power, which is a fundamental aspect of sovereignty and which cannot be abdicated, delegated, or controlled by contract. (See *Laurel Hill Cemetery* v. *City and County* (1907) 152 Cal. 464, 475-476 [93 P. 70].) The Legislature has created a statutory scheme for the exercise of the police power with respect to hazardous waste property and that scheme cannot be thwarted by contract arrangement.[19]

To the extent that Beck's cause of action seeks to compel the Department to make a determination without controlling the result of that determination, it is cumulative to the conclusion we have reached with respect to its cause of action for mandate. We have already determined that Beck has a right, enforceable by mandate, to a determination by the Department, after which it will either obtain a letter stating there is no currently known hazard or will be entitled to a designation hearing as provided by statute. Since issuance of the writ of mandate is an adequate legal remedy which will provide Beck with all the relief it could obtain through an order for specific performance, it is unnecessary to duplicate the relief thus granted. (*Tamarind Lithography Workshop, Inc.* v. *Sanders* (1983) 143 Cal.App.3d 571, 575 [193 Cal.Rptr. 409].)

To the extent that Beck's claim seeks to require the Department to recommend mitigation measures, we conclude that it is premature. As Beck points out, up to this point in time any effort at remediation would have been at best difficult in view of the ever-shifting and ill-defined concerns expressed by the Department with respect to the property. However, this is one of the problems that the procedural safeguards required by due process and the statutory designation hearing scheme are intended to resolve. Beck is entitled to a specific determination by the Department whether the property is a hazardous waste property, notice of the reasons therefor, a hearing at which the Department bears the burden or proof, and a written decision by the director containing express "findings of fact based upon the issues presented, including the reasons for this designation, the substances on,

---

[19]The statutory provisions by which a property owner and the Department may agree to designate the owner's property, or a portion thereof, as hazardous waste property are not to the contrary. (§§ 25221.1, subd. (e), 25222.1.) The procedural safeguards incorporated in article 11 are for the benefit of the landowner and obviously a landowner can waive its rights and accept use restrictions if it so chooses. Nor do we imply that the Department cannot engage in a full range of discussions with a landowner before reaching a determination whether property should be designated hazardous waste property. Article 11 is designed to encourage such predecision exchanges of information to promote accurate determinations. (See §§ 25220, subd. (b), 25221.1.) What the Department cannot do is to make an agreement that will compel it to make a particular determination or will otherwise control its performance of its duties under article 11.

under, or in the land, and the significant existing or potential hazards to present or future public health and safety, . . ." (§ 25229, subd. (b).) Such a decision must be sufficient to inform Beck of exactly what warrants the imposition of use restrictions on its property. (See *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12].) If use restrictions are imposed following such a procedure, then Beck will know what it must address in order to seek a variance or the removal of the use restrictions and at that time it may seek advice on how to remediate the specific identified problems.[20]

## II. *Beck v. The City*

■ As we have recounted, at the same time Beck was attempting to obtain a departmental determination whether its land should be designated hazardous waste property, it was also attempting to commence the process for subdividing the land by submitting an application for approval of a tentative subdivision map to the City. The City has refused to undertake the procedures for considering Beck's application and has instead insisted that the application is incomplete and need not be accepted or considered until a determination by the Department is obtained. Beck sought, but was denied, a declaration that the City must accept and consider its application for approval of its tentative subdivision map. We agree with Beck that it is entitled to relief and shall reverse the judgment in this respect.

Consideration of this question requires a brief overview of our statutory scheme for land use regulation by local governments.[21] In this respect there is a hierarchy of land use controls that may be adopted and implemented by a city which progress from general policies to particular land use decisions with respect to individual parcels.

Every city is required to adopt a comprehensive, long-term general plan for the physical development of the city. (Gov. Code, § 65300.) The general

---

[20]As the record demonstrates, remediation is a matter that may come under the jurisdiction of other agencies. For example, the City's construction of the Schulte Road extension and drainage ditch and the remediation of the soil removed during that project were supervised by the Regional Water Quality Control Board. If Beck's land does in fact warrant a hazardous waste property designation, then both the remediation measures that must be undertaken and the responsible agency, if any, are matters that can be determined only after specific hazards are identified through the hearing process.

[21]The statutory provisions for local land use planning that we mention here are applicable to both cities and counties. The requirements for chartered cities differ somewhat from the requirements for general law cities and counties. The City a general law city and we shall focus on the requirements applicable to general law cities to the exclusion of chartered cities and counties.

plan and elements and parts thereof must be an integrated, internally consistent and compatible statement of policies for the city. (Gov. Code, § 65300.5.) The adoption of a general plan is a legislative act which must be accomplished by resolution, with public participation, and after at least one public hearing. (Gov. Code, § 65350 et seq.) A general plan may be amended in the same manner as required for adoption of the plan, provided that specific plans or other plans of the city that are applicable to the same areas or matters are reviewed and amended as necessary to maintain consistency with the general plan. (Gov. Code, §§ 65358, 65359.)

After adoption of a general plan, a city may adopt, by resolution or ordinance, a specific plan or plans for the systematic implementation of the general plan for all or part of the city. (Gov. Code, §§ 65450, 65453.) A specific plan must be consistent with the city's general plan. (Gov. Code, § 65454.) Among other things, a specific plan must contain standards and criteria by which development will proceed, and a program of implementation including regulations, programs, public works projects, and financing measures. (Gov. Code, § 65451, subd. (a)(3) & (4).) After adoption of a specific plan, no zoning ordinance, and no tentative subdivision map, may be adopted unless consistent with the specific plan. (Gov. Code, § 65455.)

Zoning regulations are the means by which a city may directly control the development and use of specific property within its jurisdiction. The Legislature has indicated an intent to provide maximum control over zoning matters to local governments while ensuring uniformity of, and public access to, zoning and planning hearings. (Gov. Code, §§ 65800, 65804.) Zoning ordinances may be adopted after noticed public hearings. (Gov. Code, §§ 65854, 65856-65857.) The usual procedures for the adoption of zoning ordinances can be somewhat time consuming, and in this respect the Legislature has recognized the potential need for urgent, interim action to protect the public health and safety. In Government Code section 65858, set out in full in the margin, the Legislature has vested cities with the power to adopt development moratoriums.[22] Such a development moratorium may be adopted on an urgent but temporary basis and only through action by the

---

[22]Government Code section 65858 provides: "(a) Without following the procedures otherwise required prior to the adoption of a zoning ordinance, the legislative body, to protect the public safety, health and welfare, may adopt as an urgency measure an interim ordinance prohibiting any uses which may be in conflict with a contemplated general plan, specific plan, or zoning proposal which the legislative body, planning commission or the planning department is considering or studying or intends to study within a reasonable time. That urgency measure shall require a four-fifths vote of the legislative body for adoption. The interim ordinance shall be of no further force and effect 45 days from its date of adoption. After notice pursuant to Section 65090 and public hearing, the legislative body may extend the interim ordinance for 10 months and 15 days and subsequently extend the interim ordinance

city's legislative body with notice and the right to a hearing. (Gov. Code, § 65858.)

Where, as here, a landowner wishes to subdivide its property, the proposed subdivision must be consistent with applicable zoning ordinances and the landowner must comply with the Subdivision Map Act. (Gov. Code, § 66410 et seq.) The Subdivision Map Act vests the regulation and control of the design and improvement of subdivisions in the legislative bodies of local agencies. (Gov. Code, § 66411.) Every local agency is required by the act to adopt ordinances to regulate and control the initial design and development of subdivisions. (Gov. Code, § 66411.) For land divisions within its coverage, the Subdivision Map Act requires a subdivider to file a tentative map and a subsequent final map. (Gov. Code, § 66426.)[23] The tentative map is made for the purpose of showing the design and improvement of the

---

for one year. Any extension shall also require a four-fifths vote for adoption. Not more than two extensions may be adopted. [¶] (b) Alternatively, an interim ordinance may be adopted by a four-fifths vote following notice pursuant to Section 65090 and public hearing, in which case it shall be of no further force and effect 45 days from its date of adoption. After notice pursuant to Section 65090 and public hearing, the legislative body may by a four-fifths vote extend the interim ordinance for 22 months and 15 days. [¶] (c) The legislative body shall not adopt or extend any interim ordinance pursuant to this section unless the ordinance contains a finding that there is a current and immediate threat to the public health, safety, or welfare, and that the approval of additional subdivisions, use permits, variances, building permits, or any other applicable entitlement for use which is required in order to comply with a zoning ordinance would result in that threat to public health, safety, or welfare. [¶] (d) Ten days prior to the expiration of an interim ordinance or any extension, the legislative body shall issue a written report describing the measures taken to alleviate the condition which led to the adoption of the ordinance. [¶] (e) When an interim ordinance has been adopted, every subsequent ordinance adopted pursuant to this section, covering the whole or a part of the same property, shall automatically terminate and be of no further force or effect upon the termination of the first interim ordinance or any extension of the ordinance as provided in this section."

This version of Government Code section 65858 is as amended in 1992. (Stats. 1992, ch. 231, § 1.) In all significant respects this is as the statute has read throughout Beck's dealings with the City with respect to the Kagehiro property. However, the version of this section that was in effect when Beck first began dealing with the City contained a sunset provision by which it would become inoperative on January 1, 1989, and a new version of the statute would become operative on that date. (Stats. 1982, ch. 1108, §§ 1, 2, pp. 4021-4022.) Before that occurred the Legislature repealed the new version and enacted a version in substantially the same form as the earlier version but without the sunset provision. (Stats. 1988, ch. 1408, § 3, pp. 4766-4767.)

[23]In the division of property for which tentative and final maps are not required, the landowner may be required to file a parcel map. (Gov. Code, §§ 66444-66450.) Where a tentative map is required a landowner may elect to file a "vesting tentative map" which requires greater detail and which, upon approval, confers certain vested rights to approval of a final map consistent with the vesting tentative map. (See Gov. Code, §§ 66498.1-66498.9.) For purposes of our discussional overview, and consistent with the course of action chosen by Beck, we will focus on tentative maps to the exclusion of parcel maps and vesting tentative maps.

subdivision and the existing conditions in and around it, and is not required to be based upon an accurate or detailed final survey of the property. (Gov. Code, § 66424.5.) The subdivision of the property is accomplished through the filing and approval of a final map, which must be accomplished after the approval or conditional approval of the tentative map and before its expiration. (Gov. Code, § 66456 et seq.)

The Government Code requires local agencies to compile one or more lists of the information that will be required of an applicant for a development project, which includes an application for approval of a subdivision map. (Gov. Code, §§ 65927, 65940.)[24] The lists must be revised so that they are current and accurate at all times. (Gov. Code, § 65942.) Revisions may be prospective only and cannot be applied to applications submitted before they are effective, with exceptions not relevant here. (*Ibid.*) The lists must indicate the criteria that will be applied in determining whether an application is complete and the time limits for the review and approval of applications. (Gov. Code, §§ 65941, 65941.5.) The Government Code requires a prompt agency determination whether an application is complete, the provision of specific information as to the requirements to complete an incomplete application, and a right of appeal if the local agency finds the application to be incomplete. (Gov. Code, § 65943.)

When a tentative map is submitted and deemed complete, a local agency must approve, conditionally approve, or disapprove the map within time limits established in the Government Code. (Gov. Code, §§ 65950, 65952, 65952.1, 66452.1, 66452.2, 66463.) This action may be taken by an advisory agency with an appeal to the legislative body, if the local government's ordinances so provide, or may be taken by the legislative body. (Gov. Code, §§ 66452.1-66452.5.) The Government Code provides a list of factual findings that will support the denial of approval of a tentative map. (Gov. Code,

---

[24]In this respect the Legislature has made provision for the disclosure of information concerning properties determined by state agencies to be potentially harmful to the public health and safety, including hazardous waste properties. Each local agency is required to revise its list of information required of an applicant to include a certificate of compliance with Government Code section 65962.5. Government Code section 65962.5 requires certain state agencies to maintain lists of properties upon which official action has been taken. In this section the Department is an affected agency and is required to maintain a list of properties which have been designated as hazardous waste or border zone properties. An applicant for a development permit is required to review these lists and to state in the application whether the property is on one of the lists. (Gov. Code, § 65940.) Insofar as the Department and properties within its jurisdiction are concerned, this procedure applies only to properties that have been designated as hazardous waste or border zone properties, which, as we have noted, requires notice, a public hearing, and a written decision by the director.

§§ 66474.)[25] In considering whether to approve or disapprove a tentative map, a local agency may apply only ordinances, policies and standards which were in effect at the time the application was determined to be complete. (Gov. Code, § 66474.2, subd. (a).) This provision does not apply if the local agency has initiated proceedings to change its applicable general or specific plans, or zoning or subdivision ordinances by way of ordinance, resolution or motion, and has published sufficient notice of the proposed changes. (Gov. Code, § 66474.2, subd. (b)(1) & (2).) In that event the local agency may apply such changes as are in effect when it approves or disapproves the application. (Gov. Code, § 66474.2, subd. (b).)

Following approval of the tentative map and before its expiration, the subdivider must file a final map. The final map must be prepared under the direction of a registered civil engineer or licensed land surveyor and must be accompanied by various certificates and statements. (Gov. Code, § 66434 et seq.) The approval of a tentative map gives the subdivider certain rights with respect to approval of a final map. Thus, a final map may not be disapproved if it is in substantial compliance with a previously approved tentative map. (Gov. Code, § 66474.1.) And only those requirements and conditions that were applicable to the subdivision at the time of approval of the tentative map may be considered with respect to the final map. (Gov. Code, § 66473.) In other words, the time for the local agency to take action with respect to a proposed subdivision is when the tentative map is under consideration and, provided the final map is in substantial compliance with the tentative map and any conditions imposed on its approval, the approval of the final map becomes a ministerial act. (See *Youngblood* v. *Board of Supervisors* (1978) 22 Cal.3d 644, 656 [150 Cal.Rptr. 242, 586 P.2d 556].)

The filing of the final map establishes the subdivision, but in order to build upon the land the developer must still comply with any applicable requirements for obtaining building permits or other permits. However, in the case of a residential development, the approval of the tentative map and filing of the final map vest the developer with certain rights with respect to obtaining such permits. Specifically, during a five-year period following filing of the final map, a local government may not impose a condition on the issuance of such a permit, and may not deny such a permit, based upon any condition that could have been but was not imposed as a condition to the approval of the tentative map. (Gov. Code, § 65961.) However, a local

---

[25]These findings are concerned with such things as consistency with general and specific plans, suitability of the site for the development and density of the development, environmental impacts, and interference with public easements. The potential finding of note here is in subdivision (f): "That the design of the subdivision or the type of improvements is likely to cause serious public health problems."

government may impose a condition or requirement upon the issuance of a building permit or its equivalent if the condition could have been lawfully imposed as a condition of the approval of the tentative map and the local government finds it necessary to impose the condition because "[a] failure to do so would place the residents of the subdivision or of the immediate community, or both, in a condition perilous to their health or safety, or both." (Gov. Code, § 65961, subd. (a)(1).)[26]

When a developer successfully subdivides a property, the developer may also be required to comply with provisions of the real estate law, including a requirement that a public report be obtained and made available to prospective purchasers. (Bus. & Prof. Code, § 11000 et seq.) Among other things, the public report requirement requires disclosure of information concerning any hazards or other unusual conditions within or in the vicinity of the development. (Cal. Code Regs., tit. 10, § 2792, subd. (a)(12).)

Through these procedures the Legislature has created a detailed and comprehensive scheme for the regulation of the development and use of land. Local governments are vested with broad discretion in regulating the development and use of land, both in general through quasi-legislative acts and specifically through quasi-judicial acts with respect to particular proposed developments. However, in performing its functions, a local government must follow the statutorily mandated procedures by which the Legislature has carefully preserved procedural safeguards for affected parties.

To conclude that a local government must follow appropriate procedures with respect to regulating the development and use of land is not to conclude, as the City argues, that local governments would thus be precluded from acting to protect the health and safety of their residents. A local government has multiple means and opportunities to protect the public health and safety, including:

(1) When circumstances are discovered that may require amendment of a local agency's general or specific plans or zoning ordinances, it may enact an urgency measure to prohibit development for an interim period while it studies the matter. (Gov. Code, § 65858.) This procedure requires action by a super majority of the legislative body, must be accompanied by notice and an opportunity for a prompt hearing, and can be used only as an interim

---

[26]This exception only allows a local government to impose conditions or requirements for the issuance of a building permit and does not allow it to deny such a permit. In addition, a local government may impose a condition or deny a permit where necessary to comply with state or federal law and may assure compliance with applicable zoning ordinances. (Gov. Code, § 65961, subds. (a)(2), (b) & (c).)

measure to give the agency time to study and act formally with respect to its general or specific plans or zoning ordinances.

(2) When a local agency believes that certain information is necessary for evaluation of an application for approval of a tentative subdivision map, it may require that an applicant submit such information by including it in the lists of required information and criteria for determining the completeness of an application that the local agency is required to maintain. (Gov. Code, §§ 65927, 65940, 65942.) The lists may be revised but the revisions may not be applied to applications submitted before revision. (Gov. Code, § 65942.) In this respect the Legislature has acted to require the inclusion of information concerning a hazardous waste property designation, but has not required the inclusion of information concerning property that the Department has not undertaken to designate as a hazardous waste property. (Gov. Code, §§ 65940, 65962.5.)

(3) When a complete application has been submitted, the agency must consider it for approval but may impose conditions upon approval. The agency may deny approval if it makes one or more of certain factual findings, including that the design of the subdivision or the type of improvements is likely to cause serious public health problems. (Gov. Code, § 66474.) The requirements that an agency make factual findings and that denial may be based on a likelihood of serious public health problems preclude denial except on sufficient evidence rather than upon speculation or conjecture.

(4) After approval of a tentative subdivision map and when a developer applies for a building permit, a local agency may not impose conditions that could have been imposed on approval of the tentative map except that it may impose conditions that it finds necessary to prevent placing residents in a condition perilous to their health or safety. (Gov. Code, § 65961, subd. (a)(1).) This exception, like the bases for denial of approval of a tentative map, requires the local agency to make factual findings based on sufficient evidence rather than speculation or conjecture.

In each of these steps a landowner is entitled to notice and a hearing, a decision based upon factual findings rather than speculation, and a right of review of the decision. A landowner is obviously not necessarily entitled to approval, but the landowner is entitled to agency action based upon appropriate criteria and to approval unless the agency finds cause for denial. Nothing in the Government Code provisions respecting local land use regulation excuses a local government from following these procedures when a

hazardous waste issue is suspected. The only specific Government Code provisions concerning hazardous waste issues are those that require the Department to maintain lists of designated hazardous waste properties and require an applicant to examine the lists and disclose whether its property has been so designated. (Gov. Code, §§ 65940, 65962.5.) Such a designation would be binding upon the local agency, but unless the land has been so designated or the local agency has adopted a development moratorium in accordance with law, nothing in the Government Code permits a local agency to defer or delay its procedural obligations with respect to land use regulation.

We also find nothing in the Health and Safety Code provisions with respect to hazardous waste properties that would support the result urged by the City. The code provides that a city may request a determination from the Department, but does not provide for abeyance of local land use procedures pending departmental action. (§ 25221, subd. (c).) With respect to Health and Safety Code land use restrictions, the critical date is when the Department determines that a parcel of land should be designated as a hazardous waste property and gives statutorily required notice to the landowner and the local city or county in which the land is situated. (§§ 25222, 25232.) As of the date the hearing process is commenced through such notice, the local agency's authority to approve a subdivision is abrogated unless and until the director determines that the land should not be designated as hazardous waste property, the landowner obtains a variance from the Department, or the designation is removed. (§§ 25232-25234.) However, short of a departmental determination and the commencement of the hearing process, nothing in the Health and Safety Code provisions gives the Department the power to delay or interfere with local land use regulatory procedures. The Department is given the authority to recommend, but not to require, that local land use authorities adopt a moratorium. (§ 25221.1, subd. (b).) But nothing in the Health and Safety Code or in the Government Code permits the local authority to impose a moratorium without following appropriate procedures for doing so. (See, e.g., Gov. Code, § 65858.)

The Government Code provisions dealing with local land use regulation and the Health and Safety Code provisions dealing with hazardous waste properties are complementary and, except upon official action to designate land as hazardous waste properties, do not interfere with each other. Under these statutory schemes both the Department and the City have ample authority to act to protect the health and safety of the public from hazardous wastes but both are required to accord landowners the procedural safeguards established by the Legislature and required by the Constitution. In this case

the actions of the Department in refusing to make a determination and of the City in refusing to accept and process Beck's tentative map application without a departmental determination, operated to place Beck's development aspirations in a temporally indefinite limbo without an opportunity for a hearing, a factual showing, a formal decision, review, or any of the other procedural safeguards which are its due. We have already determined that the Department has failed to act in accordance with its duties under the Health and Safety Code. We now conclude that the City has failed to fulfill its obligations under the Government Code and that Beck is entitled to the relief it seeks. Accordingly, we shall reverse that portion of the judgment in favor of the City and against Beck.

## III. *Beck v. Southern Pacific*

Beck's claim against Southern Pacific was limited to a cause of action for an injunction to compel it to abate a nuisance and for the recovery of incidental damages. The trial court found that oil contamination of Beck's property constitutes a nuisance per se, a public nuisance, and a private nuisance. The court characterized the nuisance as continuing rather than permanent. The court entered a judgment: (1) ordering Southern Pacific to determine and define the lateral and vertical extent of petroleum contamination of the soil and groundwater of the former site of the storage reservoir; (2) ordering Southern Pacific to remediate the contamination thus identified to the standards required by the Department, the Regional Water Resources Control Board, and the City, so that the land can be utilized for single-family residence purposes; (3) retaining jurisdiction to enforce remediation of the site; (4) awarding Beck damages in the amount of $1,205,613.18; and (5) awarding Beck additional damages to the date of remediation to be determined on motion and proof satisfactory to the court. We shall reverse this judgment for lack of sufficient evidentiary support.

In determining whether a judgment is supported by substantial evidence, we may not confine our consideration to isolated bits of evidence, but must view the whole record in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the decision of the trial court. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) We may not substitute our view of the correct findings for those of the trial court; rather, we must accept any reasonable interpretation of the evidence which supports the trial court's decision. However, we may not defer to that decision entirely. "[I]f the word 'substantial' means anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must

be reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54]. See also *People* v. *Johnson, supra,* 26 Cal.3d at p. 576; *Pacific Gas & Electric Co.* v. *Zuckerman* (1987) 189 Cal.App.3d 1113, 1134 [234 Cal.Rptr. 630].)

Although each case must be judged for sufficient evidence on its own peculiar circumstances, a number of general guidelines may be set forth. ■ First, a judgment may be supported by inference, but the inference must be a reasonable conclusion from the evidence and cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork. (*Krause* v. *Apodaca* (1960) 186 Cal.App.2d 413, 418 [9 Cal.Rptr. 10].) Thus, an inference cannot stand if it is unreasonable when viewed in light of the whole record. (*Ibid.*) And although an appellate court will normally defer to the trier of fact's drawing of inferences, it has been said: "To these well settled rules there is a common sense limited exception which is aimed at preventing the trier of the facts from running away with the case. This limited exception is that the trier of the facts may not indulge in the inference when that inference is rebutted by clear, positive and uncontradicted evidence of such a nature that it is not subject to doubt in the minds of reasonable men. The trier of the facts may not believe impossibilities." (*Hicks* v. *Reis* (1943) 21 Cal.2d 654, 660 [134 P.2d 788]; see also *Gaffney* v. *Downey Savings & Loan Assn.* (1988) 200 Cal.App.3d 1154, 1168 [246 Cal.Rptr. 421].)

■ Second, the credibility of witnesses is generally a matter for the trier of fact to resolve. Accordingly, the testimony of a witness offered in support of a judgment may not be rejected on appeal unless it is physically impossible or inherently improbable and such inherent improbability plainly appears. (*People* v. *Ozene* (1972) 27 Cal.App.3d 905, 910 [104 Cal.Rptr. 170].) Similarly, the testimony of a witness in derogation of the judgment may not be credited on appeal simply because it contradicts the plaintiff's evidence, regardless how "overwhelming" it is claimed to be. (*Buckhantz* v. *R. G. Hamilton & Co.* (1945) 71 Cal.App.2d 777, 780 [163 P.2d 756].) Moreover, so long as the trier of fact does not act arbitrarily and has a rational ground for doing so, it may reject the testimony of a witness even though the witness is uncontradicted. (*Hicks* v. *Reis, supra,* 21 Cal.2d at pp. 659-660; *Blank* v. *Coffin* (1942) 20 Cal.2d 457, 461 [126 P.2d 868].) Consequently, the testimony of a witness which has been rejected by the trier of fact cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved. (*Blank* v. *Coffin, supra,* 20 Cal.2d at p. 461.) To these rules we must add one caveat.

The rejection of a witness's testimony by the trier of fact has only the effect of removing that testimony from the evidentiary mix. Without more, the disregard or disbelief of the testimony of a witness is not affirmative evidence of a contrary conclusion. (See *Bose Corp.* v. *Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 512 [80 L.Ed.2d 502, 524, 104 S.Ct. 1949]. See also *Hicks* v. *Reis, supra,* 21 Cal.2d at p. 660; *Market Street Ry. Co.* v. *George* (1931) 116 Cal.App. 572, 576 [3 P.2d 41].) In other words, the fact that the trier of fact does not credit a witness's testimony does not entitle it to adopt an opposite version of the facts which otherwise lacks evidentiary support.

Finally, we address the effect of the burden of proof on the appellate process. The burden of proof is defined in the Evidence Code as "the obligation of a party to establish by evidence a requisite degree of belief concerning a fact in the mind of the trier of fact or the court." (Evid. Code, § 115.) ▇▇▇ In a civil case the party with the burden of proof must convince the trier of fact that its version of a fact is more likely than not the true version. Stated another way, it requires the burdened party "to convince the trier of fact that the existence of a particular fact is more probable than its nonexistence—a degree of proof usually described as proof by a preponderance of the evidence." (Cal. Law Revision Com. com., 29B pt. 1 West's Ann. Evid. Code (1995) § 500, p. 553.)

"Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." (Evid. Code, § 500.) This means that the definitional elements of a plaintiff's cause of action describe the minimum showing which the plaintiff must make to support a favorable judgment. (*Oldenburg* v. *Sears, Roebuck & Co.* (1957) 152 Cal.App.2d 733, 741 [314 P.2d 33]; *Estate of Teed, supra,* 112 Cal.App.2d at p. 644.) Accordingly, in order for the plaintiff to prevail the record must contain sufficient evidence to support a finding in its favor on each and every element which the law requires to support recovery. (*Ibid.*) No matter how overwhelming the proof of some elements of a cause of action, a plaintiff is not entitled to a judgment unless there is sufficient evidence to support all of the requisite elements of the cause of action.

▇▇▇ These general principles have particular application with respect to two of the trial court's factual findings. We have recounted in our previous discussion the extensive efforts Beck undertook to convince the Department that its property was not hazardous. The Department did not conduct its own investigation of the property and did not conclude that the property is

hazardous and should be designated hazardous waste property. Instead, the Department refused to make a determination with respect to the property and insisted that Beck had failed to convince it that the property is nonhazardous. Although the court found the Department's indefinite and vacillating position with respect to the property to be of little value, it also discounted the evidence produced by Beck's experts in an effort to obtain clearance from the Department. In doing so the court reasoned that Beck's consultants performed their evaluations at a time when Beck was proceeding as a developer attempting to get clearance for the property and thus may have performed testing in a strategic manner to support that position. The court further concluded that the site had not been properly characterized or completely tested, and held that both Beck and Southern Pacific had avoided properly characterizing the site.

These findings by the trial court do not support a judgment in favor of Beck. In determining the persuasive force of the evidence, the trial court was entitled to reject or to discount the value of the evidence from Beck's consultants that the site was safe.[27] But the rejection of that evidence does not support a contrary finding; it is not evidence that the site is unsafe. The finding that neither side adequately characterized or tested the site is a finding of a failure of proof that must be held against Beck since, as plaintiff, it had the burden of proof. In short, Southern Pacific, as the defendant, did not have the burden of proof and hence was not obligated to prove the site was nonhazardous. As a result, Beck's failure to present adequate proof that the site was hazardous must be held in favor of Southern Pacific and against Beck. With these conclusions in mind we proceed to a discussion of the court's ultimate findings.

■■■ The trial court found that the oil contamination beneath Beck's property is a nuisance per se. We reject that finding as legally insupportable and hold that it is not a nuisance per se. ■■■ The concept of a nuisance per se arises when a legislative body with appropriate jurisdiction, in the exercise of the police power, expressly declares a particular object or substance, activity, or circumstance, to be a nuisance. Generally a nuisance

---

[27]Generally a trier of fact may reject the evidence of a witness, including an expert, even though that evidence is uncontradicted. However, the trier of fact may not act arbitrarily in doing so and thus where testimony is uncontradicted, unimpeached, and no rational reason for rejecting it appears, then the trier of fact may not reject it. (See *Krause* v. *Apodaca, supra,* 186 Cal.App.2d at p. 417.) The analytical test results obtained by Beck's consultants are in this category since no one involved has disputed the accuracy of those results nor offered any contrary evidence. However, we do not understand the trial court to have rejected those results. Rather, the court rejected the conclusion that the testing as performed was adequate to resolve questions concerning the safety of the site. For the reasons given by the court, it was within its fact-finding role to reject the evidence in that respect.

is defined as "[a]nything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, . . ." (Civ. Code, § 3479.) This requires consideration and balancing of a variety of factors. (See *Anderson v. Souza* (1952) 38 Cal.2d 825, 843-844 [243 P.2d 497]; *Ambrosini v. Alisal Sanitary Dist.* (1957) 154 Cal.App.2d 720, 727 [317 P.2d 33].) However, where the law expressly declares something to be a nuisance, then no inquiry beyond its existence need be made and in this sense its mere existence is said to be a nuisance per se. (*City of Costa Mesa v. Soffer* (1992) 11 Cal.App.4th 378, 382 [13 Cal.Rptr.2d 735].) But, to rephrase the rule, to be considered a nuisance per se the object, substance, activity or circumstance at issue must be expressly declared to be a nuisance by its very existence by some applicable law.

 There are multiple agencies, such as the Department and the Regional Water Quality Control Board, with jurisdiction over the situation existing on Beck's property. However, no agency has taken action through appropriate administrative or judicial procedures against Beck or its property. Accordingly, the fact that various statutory schemes vest certain public agencies with jurisdiction over the issue is irrelevant in this action by one private party against another for abatement of a nuisance. To support a claim of nuisance per se the plaintiff must point to a statutory provision that declares the alleged contamination to be a nuisance regardless of the action or inaction of any public agency.

In finding a nuisance per se the trial court relied upon the Porter-Cologne Water Quality Control Act (Water Act). (Wat. Code, § 13000 et seq.) We conclude that reliance upon the Water Act does not support a finding of nuisance per se. The Water Act was not operative until 1970, which was 25 years after Southern Pacific ceased using its reservoir and sold the property to Hachman. (Stats. 1969, ch. 482, p. 1046.) In many instances there are constitutional prohibitions and in all instances there is a constructional policy against the retroactive application of legislation. (See *People v. Smith* (1983) 34 Cal.3d 251, 259 [193 Cal.Rptr. 692, 667 P.2d 149]; *In re Cindy B.* (1987) 192 Cal.App.3d 771, 779 [237 Cal.Rptr. 677]; *DiGenova v. State Board of Education* (1962) 57 Cal.2d 167, 174 [18 Cal.Rptr. 369, 367 P.2d 865]; *Aetna Cas. & Surety Co. v. Ind. Acc. Com.* (1947) 30 Cal.2d 388, 394 [182 P.2d 159].) In general, legislation that makes certain conduct unlawful cannot be applied to conduct that was lawful and completed before its enactment. (*Ibid.*) Accordingly, we conclude that to the extent the

court relied upon Southern Pacific's *conduct* in the years preceding 1945 in finding that it created a nuisance per se, its reliance upon the Water Act was misplaced.[28]

Beck asserts that the reliance upon the Water Act is appropriate because that act can be applied to the current circumstances of the land to find that a nuisance per se exists. In Beck's view, "[s]ince the contamination in this case constitutes a nuisance pursuant to Water Code section 13050, subdivision (m), such a condition is a nuisance per se." The assertion is unavailing because the Water Act does not declare the circumstances existing on the property to be a nuisance without the need for further inquiry. Under the Water Act, "nuisance" is defined as anything that: "(1) Is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property. [¶] (2) Affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal. [¶] (3) Occurs during, or as a result of, the treatment or disposal of wastes." (Wat. Code, § 13050, subd. (m)(1), (2) & (3), Stats. 1991, ch. 187.) The first part of this definition corresponds with the general Civil Code definition of a nuisance. (Civ. Code, § 3479.) The second part corresponds with the general Civil Code definition of a public nuisance, thus eliminating private nuisances from its scope. (Civ. Code, §§ 3480, 3481.) The third part adds a requirement that the nuisance arise from the treatment or disposal of waste, thus narrowing the scope of public nuisances that come within this definitional limitation. In this statutory definition the Water Act does not expressly declare anything to be a nuisance by its very existence; rather, it incorporates the general factual inquiry relating to and defining nuisances, limits its application to public nuisances, and establishes additional limiting factors. This definition does not identify the circumstances of Beck's land, nor any circumstances, as a nuisance by its very existence without further inquiry. Moreover, as we shall explain below, we find insufficient evidence to identify the circumstances of Beck's property as a public nuisance, and thus conclude that Beck's property does not come within the definition of a

[28]On appeal Beck attempts to rely upon former Health and Safety Code provisions relating to sewage disposal that were in effect during at least part of Southern Pacific's usage of the storage reservoir. (Former § 5410 et seq., Stats. 1939, ch. 60, pp. 611-613.) Beck cannot rely upon those provisions on appeal because it did not do so in the trial court, Southern Pacific had no notice or opportunity to address issues presented under those provisions, and the factual questions which would require resolution, such as whether Southern Pacific discharged waste into "waters used or intended to be used for human or animal consumption or for domestic purposes" (former § 5417), and whether it had a discharge permit, cannot be resolved on the record presented.

nuisance under Water Code section 13050, subdivision (m), in any event. Accordingly, we reject the finding of a nuisance per se.

The trial court also found the alleged contamination under Beck's property to constitute a public nuisance. As we have previously set forth, the Civil Code defines a nuisance as something that is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property. (Civ. Code, § 3479.) "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." (Civ. Code, § 3480.) In contrast, "[e]very nuisance not included in the definition of the last section is private." (Civ. Code, § 3481.) In determining whether something is a public nuisance, the focus must be upon whether an entire neighborhood or community or at least a considerable number of persons are affected in the manner and by the factors that make the thing a nuisance under Civil Code section 3479. (See *Eaton v. Klimm* (1933) 217 Cal. 362, 368 [18 P.2d 678]; *Venuto v. Owens-Corning Fiberglas Corp.* (1971) 22 Cal.App.3d 116, 123 [99 Cal.Rptr. 350]; *Biber v. O'Brien* (1934) 138 Cal.App. 353, 357 [32 P.2d 425].) In other words, a private nuisance does not become a public nuisance merely because the public may be said to be affected in some tangential manner rather than specifically in the manner set forth in Civil Code section 3479.

The primary public effect found by the trial court related to the City's loss of development fees if Beck is unable to use its property for residential development. That does not describe a situation that is injurious to public health, or is indecent or offensive to the senses of the public, or which is an obstruction to the free use of property by the public. Accordingly, that is not the type of effect on the public that will support finding the circumstances of Beck's property to be a public nuisance.

The trial court also indicated that the oil contamination under Beck's property "has and does impact lands owned by the City of Tracy, Tracy Unified School District and others." The court did not indicate what others it was referring to and we find no evidence of a specific injurious impact on surrounding lands. As we have noted in our factual recitation, after this litigation commenced Beck sold portions of its land to the City under threat of condemnation for road and ditch purposes and to the school district under an order of condemnation. Portions of those parcels overlie the buried storage reservoir. But the City built its road and ditch, and the school district

built its high school, and there is no evidence that they are in any way restricted from using the property for those purposes or that the land is injurious to the health of the users of those properties.[29]

The finding of a public nuisance is not supported by any specific evidence of the type of effect identified in Civil Code section 3479. Other than Beck's difficulties in developing its property as it wishes, the only potential attribute of a nuisance that was suggested was the possibility of health concerns. The only health concerns that could arise would be through the possibility of exposure to the substance underlying the land. Only two potential pathways of exposure were suggested, these being personal proximity if the substance should be brought to the surface or if someone should dig down into it, and exposure through the water supply if the substance should invade the water supply.

The evidence was uncontradicted that the substance under Beck's property poses no risk to health through personal proximity if it is left where it is. When oil contamination was discovered during the City's road and ditch project, samples were subjected to testing and determined to be nontoxic and nonhazardous. When the extensive testing by Beck's consultants failed to detect chemicals of concern, the Department did not take the position that the testing established a health danger but concluded only that the testing was not sufficient to rule it out. But despite the Department's often vacillating assertions in other respects, it has been consistent in the view that its only concern is the possibility that future homeowners may dig up the substance underlying the land if the land is developed for single-family residences. No expert testified to the contrary, and the only conclusion supported by the evidence is that the substance in situs under the land is not injurious to the public health through the pathway of personal proximity.

---

[29]It would seem doubtful that a plaintiff should be permitted to transform a private nuisance into a public nuisance by transferring portions of its property to others after commencing litigation to abate the nuisance. However, that is not a question we must consider since we find no evidence that the oil contamination is injurious to health, indecent or offensive to the senses, or an obstruction to the free use of property with respect to the road, the ditch, and the school. However, this point does illustrate a major difficulty in Beck's attempt to proceed under a nuisance per se and/or public nuisance theory. If the oil is a nuisance per se, that is, a nuisance by its very existence, then only abatement of its entire existence will suffice. If the oil is a public nuisance, as the trial court reasoned, by the possibility that it could invade the groundwater, then only complete abatement can eliminate that potential. But complete abatement would require Southern Pacific to take action upon land that does not belong to Beck and would likely interfere with the public use of the road, the ditch, and the school, and might even require the total or partial destruction of those improvements. However, Beck did not name the City or the school district as parties and they did not otherwise participate in the nuisance cause of action. Accordingly, the court could not make or enforce an abatement order upon those lands and, while remediation of Beck's property would satisfy Beck, such a limited order would not abate the alleged public nuisance.

██ This brings us to the groundwater pathway of potential public exposure. "Groundwater is water within the earth's zone of saturation. Vadose water—water above the zone of saturation and in the zone of aeration, and not capable of withdrawal by wells—is generally excluded from this definition." (Tarlock, Law of Water Rights and Resources, Environmental Law Series (1995 rev.) § 4.02, p. 4-2, fn. omitted.) Despite this explanation, "groundwater" is not a word with fixed meaning under California law, and it is sometimes used simply to refer to any water which is under rather than upon the ground. (See 62 Cal.Jur.3d, Water, § 386 et seq., p. 419 et seq.) The resolution of a particular claim of nuisance cannot be resolved definitionally and instead must be determined by reference to the peculiar facts and circumstances shown by the evidence. Where, as here, it is claimed that a substance underlying the plaintiff's land creates a public nuisance, it is not enough that some water on or in the land may come into contact with the substance. Rather, it must be shown that the substance has, or at least is likely to have, invaded the water supplies of the public or of a considerable number of persons with one or more of the effects set forth in Civil Code section 3479. ██ Such evidence is lacking here.

First, there is no evidence that the substance under Beck's property has invaded other property or the water supplies of other persons. None of the samples drawn from the monitoring wells over a period of several years indicated contamination of the groundwater and the testimony of the experts was unanimous to that effect. Although none of the experts questioned the result of the testing per se, some questioned whether the monitoring wells were placed in a manner sufficient to rule out the possibility of contamination. Thus, Robert Evans, an engineer with the State Water Resources Control Board, testified that the wells were placed in accordance with the existing groundwater gradient but in that area the gradient can change and the wells would not detect a problem in the event of an altered gradient. Russell Juncal, a hydrogeologist with Resna Industries, testified that the groundwater gradient was from the reservoir and toward the monitoring wells. However, he added that information in the technical literature indicates that it is possible for contamination to be present in a very narrow zone and thus be missed by monitoring wells. While this evidence may support the view that the testing that was done was not sufficient to rule out the possibility of contamination, it is not affirmative evidence of contamination and no affirmative evidence of contamination was otherwise presented.

This brings us to the question of the potential for future contamination of public water supplies. The evidence is that any contamination of the soil on Beck's property from the old storage reservoir is at relatively shallow

depths, that is, no more than 16 feet. The shallow groundwater in the area is of poor quality and water users draw their supplies from much deeper sources, that is, from 200 feet or deeper. No evidence was presented to suggest a possibility that the contamination under Beck's land might invade the deeper water sources used by the public.

With respect to the shallow groundwater, the evidence concerning the potential for contamination was sufficient to show that it cannot be ruled out but was insufficient to establish a likelihood or probability of future contamination. It was shown during the City's Schulte Road and drainage ditch project that a pit was dug to a depth of about 19 feet in an area believed to overlie the reservoir. At a depth of about 12 feet there began a layer of broken concrete believed to be from the floor of the reservoir. Above and slightly below the concrete the soil was very sandy. Below that and sitting on a layer of hard silty clay was about a three-inch layer of soil contaminated with a viscous oily material. Water seeped into the pit and filled it to a level just below the layer of oil contamination. The experience with this pit gave rise to an inference that at some time the floor of the old reservoir had cracked or broken and that Bunker C oil had leaked into the soil where it came to rest on the layer of hard, tighter soil on which it was observed.

Samples of the contaminated soil from the pit were tested and the material was found to be nontoxic and nonhazardous. The hydrocarbons present in the soil were found to "have negligible solubility and preferentially sorb into soils," meaning they are not readily leachable, do not dissolve in great quantities in water, and preferentially remain in the soil grains to which they had attached. Based upon this information and the information from the monitoring wells, the Regional Water Quality Control Board undertook supervision of the handling and disposal of soils that would be excavated and removed from the site during construction, but did not order further testing or take any other action with respect to the soils in the ground.

This information, together with the general knowledge that Bunker C oil is a very viscous and relatively immobile fraction of crude oil, particularly at cooler subterranean temperatures, would suggest that it is unlikely that the contamination under Beck's property will invade public water supplies. Nevertheless, Bunker C oil is not completely immobile and can migrate under some circumstances. This fact, and the lack of sufficient characterization and migration studies at the site, precluded the experts from ruling out the possibility of migration. In its statement of decision the trial court found it to be "crystal clear" that the site has not been adequately characterized and

that the testing that was done was not sufficient to rule out groundwater contamination. After discussing what it perceived as the failure of both parties to adequately characterize the site, the court went on to conclude that the site presents a substantial risk to the public health and found it to be a public nuisance.

Civil Code section 3479 sets forth the acts which constitute a nuisance in the present tense. Under its terms, anything that "is" injurious to health, indecent or offensive to the senses, or an obstruction to the free use of property is defined as a nuisance. Despite the use of the present tense, we are satisfied that an affected party need not wait until actual injury occurs before bringing an action to enjoin a nuisance.[30] But where, as here, the demand for injunctive relief is based upon the potential or possibility of future injury then at least some showing of the likelihood and magnitude of such an event must be made. "A mere possibility or fear of future injury from a structure, instrumentality, or business which is not a nuisance per se is not ground for injunction, and equity will not interfere where the apprehended injury is doubtful or speculative; reasonable probability, or even reasonable certainty, of injury, or a showing that there will necessarily be a nuisance, is required." (66 C.J.S. (1950) Nuisances, § 113, p. 879.) In order for a private party to enjoin an alleged public nuisance on the ground of fear of future injury, it must, at a minimum, establish facts to prove that the apprehension of injury is well founded. (*Payne* v. *McKinley* (1880) 54 Cal. 532, 533.) And the proof required cannot be speculative and must amount to more than the conclusory opinions of experts. (*Jardine* v. *City of Pasadena* (1926) 199 Cal. 64, 75 [248 P. 225, 48 A.L.R. 509].) Thus, while no one has the right to inflict unnecessary and extreme danger to the life, property and happiness of others (*County of San Diego* v. *Carlstrom* (1961) 196 Cal.App.2d 485, 491 [16 Cal.Rptr. 667]), to establish a nuisance the plaintiff must demonstrate an actual and unnecessary hazard. (*People* v. *Oliver* (1948) 86 Cal.App.2d 885, 889-890 [195 P.2d 926].)

In this case we need not, and therefore do not, attempt to describe some minimum level of probability that a private party must show to support abatement of an alleged nuisance on the basis of apprehension of future

---

[30]Where a claim of nuisance is based upon an alleged apprehension of future injury, there is a distinction drawn between an action by a public entity to enjoin the nuisance and an action brought by a private party. (See *Koll-Irvine Center Property Owners Assn.* v. *County of Orange* (1994) 24 Cal.App.4th 1036, 1040-1041 [29 Cal.Rptr.2d 664]; *Brown* v. *Petrolane, Inc.* (1980) 102 Cal.App.3d 720, 725-726 [162 Cal.Rptr. 551].) In *Koll-Irvine Center, supra,* it was conceded that the facts alleged would support an abatement action by a public entity, but the court nevertheless held that a private party could not maintain an action on either a public or private nuisance theory. (24 Cal.App.4th at pp. 1040-1043.)

harm. In *County of San Diego* v. *Carlstrom, supra,* 196 Cal.App.2d at pages 490 and 491, an action by a public entity to abate a public nuisance, the court suggested that the inquiry should consist of balancing such things as the nature and magnitude of the threatened injury, the number of people affected, and the practicality and burdens of abatement. In such an inquiry the burden must be on the plaintiff to establish some measure of such things as the magnitude and likelihood of the danger and it cannot be enough to merely suggest a danger and assert that it has not been ruled out.

In this case Beck has failed to meet its burden of proof. There was no evidence to establish any likelihood that the substance under Beck's property will invade the deeper groundwaters from which public water supplies are drawn. There was no evidence of the effect on the public, if any, that the substance would have if it migrated off Beck's property and came into contact with the shallow groundwaters in the area. And there was no evidence to establish any measure of the likelihood that such an event might occur. Instead, the evidence was simply to the effect that the testing that was done was inadequate to support firm factual conclusions, and that the possibility of migration and contact with the shallow groundwater off Beck's property could not be ruled out. This describes a failure of proof that must be held against Beck as the party who had the burden of proof. Accordingly, we find the evidence insufficient to support finding a public nuisance in the circumstances presented.

██ We turn next to the question of enjoining a private nuisance. We are satisfied that the contamination under Beck's property satisfies the definitional requirements of a private nuisance. While there is no evidence that in situs the contamination is injurious to health or is indecent or offensive to the senses, it does interfere with Beck's free use of the property in the manner it wishes. The question is whether Beck can obtain injunctive relief against a former owner of the property to compel it to remediate a condition of the property so that it can subdivide and develop the property as it desires. We conclude that under the circumstances presented it cannot do so.

First, Beck is barred from obtaining relief by the defense of consent as set forth in this court's opinion in *Mangini* v. *Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125 [281 Cal.Rptr. 827] (hereafter *Mangini I*). In *Mangini I*, the defendant had leased a large parcel of property for a 10-year period. During its occupancy the defendant was alleged to have discharged extensive amounts of hazardous wastes on or into the property which were left on or in the property at the termination of the lease. The plaintiffs were subsequent owners of the property who had been ordered to conduct testing and who

faced the possibility of governmental cleanup orders. On appeal from an order sustaining a demurrer to the complaint, we concluded that the plaintiffs could state a cause of action in nuisance. In doing so we rejected the defendant's claim that a landowner can never maintain a nuisance action against a former occupier of the land. We also rejected the defendant's claim that consent was established by the complaint as a matter of law. In so doing, however, we held that consent is a factual defense in a nuisance action against a former occupier of land. (230 Cal.App.3d at p. 1138.) Accordingly, when it appears the defendant conducted a lawful activity on a landowner's property with the consent of the landowner, the landowner will be precluded from pursuing a cause of action for nuisance based upon that consensual activity. (*Id.* at p. 1139.) We added: "Nor is a successor owner in any better position than [the original owner]. 'Where the original owner has lost the right to sue by authorizing the construction of the private nuisance . . . he clearly can pass no right to sue to his grantee.' " (*Ibid.*)

There were several caveats that accompanied our holding in *Mangini I.* First, we cautioned that we did not mean to suggest that consent can impede the abatement of a public nuisance. (*Mangini I, supra,* 230 Cal.App.3d at p. 1139.) Second, we distinguished consent in this context from the generally repudiated "coming to a nuisance" doctrine, which would preclude a land-owner from complaining of a nuisance whenever the nuisance-causing activity predated the landowner's acquisition of property. (*Ibid.*) Third, the defense is generally factual and could not be resolved on demurrer under the facts of *Mangini I.* (*Id.* at p. 1140.)[31] Finally, although we did not emphasize the point, our decision presupposed that the defendant acted lawfully in conducting the consensual activities that gave rise to the claim of nuisance. (*Id.* at p. 1139.)

These factors do not preclude the application of the consent defense here. We have previously concluded that the evidence is insufficient to support a claim of public nuisance. We have also previously noted that the evidence does not support a finding that Southern Pacific acted unlawfully in its use of the property while it was the owner. We reaffirm that we are considering the consent defense set forth in *Mangini I* and not the repudiated "coming to

---

[31]In *Mangini I* the defendant relied upon a provision in its lease whereby the owner/lessor had agreed to acquiesce in any nuisance or hazard created by certain activities the defendant would conduct upon the land. However, the lease did not specifically authorize the disposal of hazardous waste on the land and in other lease provisions the defendant had agreed not to commit waste to the lessor's reversionary interest and to surrender the premises in as good state and condition as when received except for reasonable use and wear. Together these provisions were patently ambiguous with respect to hazardous waste disposal and the consent defense could not be resolved on demurrer. (230 Cal.App.3d at p. 1140.)

a nuisance" doctrine. Given these considerations and because this appeal follows a trial, we are in a position to determine whether the evidence, construed most favorably to Beck, nevertheless compels application of the consent defense. We conclude that it does. Southern Pacific conducted its activities on the property with the consent of the owner, itself, lawfully and in an open and notorious manner from 1926 to 1945. It sold the property to John Hachman with the storage reservoir in open view and with his full knowledge of the past usage of the property. Hachman acquired no right to sue Southern Pacific for private nuisance and could have passed no such right to subsequent grantees, including Beck. (*Mangini I, supra*, 230 Cal.App.3d at p. 1139.)

In any event, we find Beck's cause of action to be barred by the statute of limitations. While there is no statute of limitations in an action brought by a public entity to abate a public nuisance, there is a three-year statute of limitations in a nuisance action brought by a private party. (Civ. Code, § 3490; Code Civ. Proc., § 338, subd. (b); *Mangini I, supra*, 230 Cal.App.3d at pp. 1142-1143.) In an action involving tortious injury to property, the injury is considered to be to the property itself rather than to the property owner, and thus the running of the statute of limitations against a claim bars the owner and all subsequent owners of the property. (*Wilshire Westwood Associates* v. *Atlantic Richfield Co.* (1993) 20 Cal.App.4th 732, 739-740 [24 Cal.Rptr.2d 562]; *CAMSI IV* v. *Hunter Technology Corp.* (1991) 230 Cal.App.3d 1525, 1534-1535 [282 Cal.Rptr. 80].) In other words, the statute of limitations does not commence to run anew every time the ownership of the property changes hands. (*Ibid.*) The injury to the property of which Beck complains occurred more than 40 years before this action was commenced and thus this action is time-barred unless there is some cause for avoidance of the statute of limitations.

The basis upon which Beck sought to avoid the bar of the statute of limitations, and which was applied by the trial court in rejecting the bar, is the distinction between permanent and continuing nuisances. ■ In general, a permanent nuisance is considered to be a permanent injury to property for which damages are assessed once and for all, while a continuing nuisance is considered to be a series of successive injuries for which the plaintiff must bring successive actions. (*Baker* v. *Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862, 868-869 [218 Cal.Rptr. 293, 705 P.2d 866].) In an action on a permanent nuisance, the plaintiff will be permitted to recover both past and prospective damages while in an action on a continuing nuisance prospective damages are unavailable and recovery is limited to actual injury suffered prior to commencement of each action. (*Ibid.*) With

respect to a permanent nuisance, the statute of limitations begins to run on the creation of the nuisance and bars all claims after its passage, while each repetition of a continuing nuisance is considered a separate wrong which commences a new period in which to bring an action for recovery based upon the new injury. (*Mangini I*, *supra*, 230 Cal.App.3d at pp. 1142-1143.)

These distinctions can create particular problems for the parties. For example, if the defendant is willing and able to abate the nuisance it may be unfair to award prospective damages on the presumption that the nuisance will continue. On the other hand, if it appears improbable that the nuisance can or will be abated, or the plaintiff is willing that the nuisance continue provided compensation is paid for past and prospective injuries, then it may be unreasonable to leave the plaintiff to the troublesome remedy of successive actions. And a too rigid distinction between permanent and continuing nuisances may constitute a trap for the unwary plaintiff who guesses wrong. For these reasons it is held that in doubtful cases the plaintiff has an election to treat a nuisance as permanent or continuing. (*Spaulding* v. *Cameron* (1952) 38 Cal.2d 265, 268-269 [239 P.2d 625]; see *Baker* v. *Burbank-Glendale-Pasadena Airport Authority*, *supra*, 39 Cal.3d at p. 870.)

While a plaintiff's election of remedies is entitled to deference in doubtful cases, that choice must nevertheless be supported by evidence that makes it reasonable under the circumstances. (See *Wilshire Westwood Associates* v. *Atlantic Richfield Co.*, *supra*, 20 Cal.App.4th at pp. 744-745; *Capogeannis* v. *Superior Court* (1993) 12 Cal.App.4th 668, 682 [15 Cal.Rptr.2d 796]; *Spar* v. *Pacific Bell* (1991) 235 Cal.App.3d 1480, 1485-1486 [1 Cal.Rptr.2d 480].) A plaintiff cannot simply allege that a nuisance is continuing in order to avoid the bar of the statute of limitations, but must present evidence that under the circumstances the nuisance may properly be considered continuing rather than permanent. (*Ibid.*) It is only where the evidence would reasonably support either classification that the plaintiff may choose which course to pursue. (*Spar* v. *Pacific Bell*, *supra*, 235 Cal.App.3d at p. 1486.)

There is no short and all-inclusive rule for distinguishing between permanent and continuing nuisances. (*Spar* v. *Pacific Bell*, *supra*, 235 Cal.App.3d at p. 1484.) From our review of the authorities we are convinced that each case must be determined upon its own peculiar circumstances with guidance from, but not straightjacket conformance with, earlier decisions. In this respect we find that decisional authorities have identified various "tests" emphasizing different factors which may be considered. We will review the circumstances of this case in light of these various tests, keeping in mind that we should uphold the plaintiff's choice of characterization if it is reasonable to do so under a given formulation.

In *Baker* v. *Burbank-Glendale-Pasadena Airport Authority*, *supra*, 39 Cal.3d at pages 868-870, the high court drew a distinction between an injury to land that is complete when the offending act is committed, and injury that is attributable to the defendant's continuing activities, the discontinuance of which would terminate the injury. In finding a continuing nuisance there, the court emphasized that the plaintiffs were not complaining of the location of the defendant's structures (an encroachment), but were complaining of the activities of the defendant on neighboring land (a continuing use). (See also *Tracy* v. *Ferrera* (1956) 144 Cal.App.2d 827, 828 [301 P.2d 905].) In this case, Southern Pacific's activities on the land were discontinued long ago, the alleged injury cannot be abated by simply discontinuing an ongoing use of the land, and Beck is complaining of the location of a substance rather than ongoing activities of the defendant. Accordingly, the continuing-use test indicates a permanent rather than continuing nuisance characterization of the injury involved here.

In *Field-Escandon* v. *DeMann* (1988) 204 Cal.App.3d 228, 234 [251 Cal.Rptr. 49], the court applied the continuing-use test to characterize as permanent a buried sewer line which bore aspects of both an encroachment and a continuing activity. The court identified the salient feature of a continuing nuisance as being an impact that may vary over time, that is, an impact that will repeatedly disturb the property or which may gradually increase over time. Here, the evidence that is available in the record indicates that the contamination under Beck's property is "permanent" in that it is and has been relatively static on a long-standing basis. (See *Spar* v. *Pacific Bell*, *supra*, 235 Cal.App.3d at p. 1486 [court felt compelled to come down solidly in favor of a permanent nuisance by reason of the long-standing nature of the encroachment].) As we have indicated previously, to the extent the evidence is insufficient to characterize the situation under Beck's property, that is, to assess the possibility of changes over time, the insufficiency of the evidence must be held against Beck rather than Southern Pacific.

Pollution cases may present peculiar problems in applying principles of nuisance law. Often they do not fit easily into the continuing-use/permanent-encroachment dichotomy because the harmful effects of the pollution may continue beyond the termination of the activity that gave rise to the harm. In such instances some courts have found that contamination may be shown to be a continuing nuisance by evidence that the contaminants continue to migrate through land and groundwater causing new and additional damage on a continuous basis. (See *Newhall Land & Farming Co.* v. *Superior Court* (1993) 19 Cal.App.4th 334, 341 [23 Cal.Rptr.2d 377]; *Capogeannis* v. *Superior Court*, *supra*, 12 Cal.App.4th at pp. 673, 681; *Arcade*

*Water Dist.* v. *U.S.* (9th Cir. 1991) 940 F.2d 1265, 1268 ["In determining under California law whether the nuisance is continuing, the most salient allegation is that contamination continues to leach into Arcade's Well 31."].) As we have previously noted, in this case there is insufficient evidence to establish that the substance under Beck's property is migrating through the land or water and causing new and additional damages on a continuous basis.

This brings us to the test most often stated in contamination cases, that is, whether the nuisance can be abated at any time. (See *Wilshire Westwood Associates* v. *Atlantic Richfield Co., supra,* 20 Cal.App.4th at p. 744; *Capogeannis* v. *Superior Court, supra,* 12 Cal.App.4th at p. 677; *Mangini I, supra,* 230 Cal.App.3d at p. 1146.) This test, in various forms and actions, has long been applied. For example, in *Kafka* v. *Bozio* (1923) 191 Cal. 746, 751 [218 P. 753, 29 A.L.R. 833], in which the defendant's building was progressively leaning onto the plaintiff's property, the court held that where a continuing or recurring injury results from a condition wrongfully created and maintained, the nuisance will be considered to be continuing. In *Phillips* v. *City of Pasadena* (1945) 27 Cal.2d 104, 108 [162 P.2d 625], the court held that a locked gate could be considered to be a continuing nuisance since it appeared that it could be removed at any time. In *Spaulding* v. *Cameron, supra,* 38 Cal.2d at page 268, and subsequently in *Kornoff* v. *Kingsburg Cotton Oil Co.* (1955) 45 Cal.2d 265, 271 [288 P.2d 507], the court said that a nuisance is continuing if the defendant is not privileged to continue the nuisance and can abate it, while it is permanent if it appears improbable as a practical matter that the nuisance can or will be abated.[32]

In *Mangini I, supra,* 230 Cal.App.3d at page 1146, a contamination case, this court said that "the crucial distinction between a permanent and continuing nuisance is whether the nuisance may be discontinued or abated." Other courts have identified the crucial test as "whether the offensive condition can be discontinued or abated at any time." (*Wilshire Westwood Associates* v. *Atlantic Richfield Co., supra,* 20 Cal.App.4th at p. 744; *Capogeannis* v.

---

[32]These authorities were applied in *Baker* v. *Burbank-Glendale-Pasadena Airport Authority, supra,* 39 Cal.3d at pages 871 to 873, in a manner that reinforces our conclusion that no single formulation may be given talismanic significance. There the complaint was based upon the defendant's continuing activity (aircraft flights) that caused noise, smoke and vibrations to invade the plaintiffs' homes. The defendant's operations were not subject to judicial abatement as a nuisance by virtue of federal preemption and thus, arguably, were privileged and could not be "abated at any time." In resolving the question the court emphasized the connection between the defendant's ongoing activity and the repetitious injury to the plaintiffs and the defendant's duty to minimize the harm even if its operations could not be enjoined. The court found that the defendant's operations were "the quintessential continuing nuisance."

*Superior Court, supra,* 12 Cal.App.4th at p. 677.) However, such formulations require reasoned analysis in their application. For example, in *Capogeannis* v. *Superior Court, supra,* 12 Cal.App.4th at pages 681 to 683, the defendant asserted that the contamination involved there could not be abated at any time because remediation would take considerable time, perhaps years, and could not entirely eradicate the contamination. In resolving the issue the court emphasized the continuing migration of the contamination, particularly into the groundwater, and the cleanup demands that had been made upon the plaintiffs by public agencies, and concluded that the ability to remediate to levels demanded by the regulatory agencies was sufficient abatability.

The abatability test, phrased as whether the nuisance can be abated at any time, is stated in such broad terms that, standing alone, it does not convey much information. Since a defendant could literally be ordered to move mountains to abate a nuisance, virtually everything can be said to be abatable if all other considerations are disregarded. (*Capogeannis* v. *Superior Court, supra,* 12 Cal.App.4th at p. 678.) Accordingly, "the discontinued-or-abated rubric should be regarded as no more than a convenient shorthand for the fundamental considerations" that must enter into the determination. (*Ibid.*) These considerations include such things as the feasible means of, and alternatives to, abatement, the time and expense involved, legitimate competing interests, and the benefits and detriments to be gained by abatement or suffered if abatement is denied. (*Ibid.*)

This view of the abatability test was recently adopted by the Supreme Court in *Mangini* v. *Aerojet General Corp.* (1996) 12 Cal.4th 1087 [51 Cal.Rptr.2d 272, 912 P.2d 1220] (hereafter *Mangini II*). In a jury trial on remand from *Mangini I*, the plaintiffs obtained a verdict for $13.2 million. On appeal in *Mangini II*, the Supreme Court, adopting in large part the decision of this court, held that the trial court should have granted the defendant's motion for judgment notwithstanding the verdict. In reaching that conclusion the court eschewed a too literal abatability rule and held that "abatable" means reasonably abatable in light of the fundamental considerations that enter into the determination, such as expense, time, and legitimate competing interests. (*Mangini II, supra,* 12 Cal.4th at p. 1100.) The cost of abatement is an appropriate consideration, and the court said "[w]e conclude 'abatable' means that the nuisance can be remedied at a reasonable cost by reasonable means." (*Id.* at p. 1103.) In that case the experts testified that not enough was known about the site to assess what remedial measures needed to be done or could be done effectively, or what the costs of remediation would be. In light of that record the court said: "The result of the uncertainty

regarding the extent of contamination is that it is uncertain whether the nuisance is abatable. Thus, we do not know how much land or water has to be decontaminated. We do not know how deep the decontamination would have to go. We have no idea how much it would cost but know only that it would cost unascertainable millions of dollars. [¶] On this record, there is no substantial evidence that the nuisance is abatable." (*Ibid.*) The court concluded that the nuisance had to be considered permanent, the statute of limitations had run, and the defendant was entitled to judgment notwithstanding the verdict. (*Ibid.*)

 When we consider the evidence in this case under the abatability test we find insufficient evidence to support the claim that the contamination under Beck's property should be characterized as a continuing rather than permanent nuisance. As we have previously held, the evidence does not establish that the buried substance is migrating to other properties or into public water supplies, or that it is otherwise injurious or offensive to the public. There is no evidence that the substance, in situs, is injurious or offensive to persons on the property. The only detriment that was established at trial and which may be weighed in the balance is the interference with Beck's use of the property in the manner it desires. It was shown that the 26 acres retained by Beck would be worth $2.6 million if entirely free of the buried oil reservoir and any soil contamination. The highest and best use of the property would be for single-family residences. Other uses, including multiple-unit dwellings, would be less suitable and Beck does not wish to devote the property to such uses. However, from the record it appears that even with the Department's final position unresolved, Beck would be permitted to develop most of the property with single-family residences and that other uses, such as multiple-unit dwellings, would be permitted for the entire property. Although Beck insists that it does not wish to adopt other uses for the property, it provided no evidence to assess the actual detriment it would suffer if abatement were denied.

The record is also sparse about the feasibility and burdens of abatement. The remedy insisted upon by Beck is the excavation of the entire property to a depth sufficient to remove the oil reservoir and any contaminated soil. In itself that would be a significant undertaking, but the record also establishes that would not be the end of the problem. Although the Department's position has vacillated in many respects, it has consistently maintained that its concern is with the possibility that the contaminated soil might be brought to the surface rather than with the soil in place under the ground. Likewise, the Regional Water Quality Control Board, which has been involved in this matter from the beginning, has consistently taken the position that nothing

further need be done and it is satisfied with leaving the contaminated soil in place. However, if soil is excavated and brought to the surface then the Department and the Regional Water Quality Control Board will have concerns and the handling, treatment and disposal of the excavated soil will require close regulatory supervision. From this record it appears that remediation as demanded by Beck would be significantly burdensome and from a public and regulatory point of view may not be the most advisable option.

The monetary expense of remediation was not established with exactitude, in part because the lack of the characterization precluded assessment of all that would be required. Kleinfelder gave Beck an estimate that indicated remediation as demanded by Beck could cost between $6.5 million and $16.2 million. It was generally agreed that the cost of remediation would greatly exceed the value of the land after remediation. In considering the relative benefits and burdens of remediation, the comparison must be between the costs of remediation and the actual detriment to the plaintiff from a failure to remediate. While the record does not include an assessment of the actual detriment Beck would suffer from a failure to remediate, it is clear that the costs of remediation would far exceed, by many multiples, the actual detriment that would be suffered if remediation is denied.

In light of these factors, and the absence of countervailing considerations, we find that the circumstances of Beck's property cannot properly be considered a continuing nuisance under the abatability test.

This conclusion is particularly compelled under the recent decision in *Mangini II, supra,* 12 Cal.4th 1087. As we have previously noted, one of the trial court's pivotal factual findings, which was supported by the opinions of Beck's experts, was that the site had not been sufficiently characterized to draw firm conclusions with respect to the extent of the contamination, and the methods and costs of remediation. From the record all that can be ascertained is that the cost of remediation is likely to be many multiples of the value of the land after remediation. It was Beck's burden to establish "that the nuisance can be remedied at a reasonable cost by reasonable means" and the result of the uncertainty in the record is that there is no substantial evidence of abatablity. (*Id.* at p. 1103.)

As we have indicated, there is no single overriding test for determination whether a nuisance is permanent or continuing. The determination must be made on the facts and circumstances of each case with guidance from the various tests that have been set forth. In this case we find insufficient evidence to support characterization of the circumstances of Beck's property

as a continuing nuisance under any of the various tests that have been employed and factors that have been considered. Accordingly, we conclude that with respect to Beck the contamination under its land is a permanent rather than continuing nuisance and the statute of limitations has long since run on this cause of action. In view of this conclusion it is unnecessary to consider the remaining points raised by Southern Pacific. Because Beck's cause of action for nuisance is barred by the statute of limitations as well as by the doctrine of consent, we shall reverse the judgment in favor of Beck and direct that judgment be entered in favor of Southern Pacific.

## DISPOSITION

The judgment granting a writ of mandate to Beck against the Department is modified to direct the Department to make a determination whether Beck's property should be designated a hazardous waste property and to proceed in accordance with the views expressed herein based upon that determination. That judgment is affirmed as so modified. The judgment in favor of the City and against Beck is reversed and the matter is remanded to the trial court with directions to issue a judgment granting declaratory relief in favor of Beck consistent with the views expressed in this opinion. The judgment in favor of Beck and against Southern Pacific is reversed and remanded to the trial court with directions to enter judgment in favor of Southern Pacific.

In Southern Pacific's appeal from the judgment in favor of Beck, Southern Pacific shall recover its costs on appeal. In all other respects, the parties shall bear their own costs.

Davis, J., and Scotland, J., concurred.

The petition of respondent Beck Development Co., Inc., for review by the Supreme Court was denied July 31, 1996.