Filed 5/19/15  In re Makayla M. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re MAKAYLA M., a Person Coming Under the Juvenile Court Law. | B259018 |
| | (Los Angeles County Super. Ct. No. DK06169) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| CRYSTAL L., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Timothy Saito, Judge.  Reversed.

Jaime A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Crystal L. (mother) appeals an order for informal supervision under Welfare and Institutions Code section 360, subdivision (b).[1]  In its petition for dependency jurisdiction, the Los Angeles County Department of Children and Family Services (the Department) alleged mother placed her one-year-old daughter, Makayla M., at risk of physical harm after receiving a report that mother's male companion, Frank Z., battered his sister in an altercation outside the apartment he then shared with mother and Makayla. Without disputing the seriousness of Frank's misconduct, mother contends the evidence was insufficient to support a finding that she neglected Makayla within the meaning of section 300, subdivision (b), because, at the time the court assumed jurisdiction over Makayla three months later, there was no evidence that mother and Makayla still lived with Frank or that mother had an ongoing relationship with Frank.  We agree with mother that the Department failed to establish a present risk of harm to Makayla at the time the juvenile court assumed jurisdiction over the child.  Accordingly, we reverse.

## FACTS AND PROCEDURAL BACKGROUND

On May 6, 2014, the Department received a referral concerning mother's live-in boyfriend, Frank, and the risk mother's relationship with Frank posed to her one-year-old daughter, Makayla.  According to the referral, Frank was involved in an altercation the previous day outside the apartment he shared with mother and Makayla.  Frank's two-year-old daughter from a different relationship, Sophia, had been at the apartment that day for a visit.  The altercation began when Sophia's mother, Stephanie, who was seven months pregnant with another child by Frank, came to the apartment to retrieve Sophia. Frank's 15-year-old sister, Brianna, accompanied Stephanie.  Not long after Stephanie arrived, she and Frank started arguing over Sophia's care.  Brianna, who was holding Sophia, attempted to intervene, at which point Frank pushed her away.  Brianna set Sophia down and slapped Frank.  Frank responded by striking Brianna in the eye, knocking her glasses off her face.  Brianna attempted to flee in the car with Stephanie and

---

[1]     Subsequent statutory references are to the Welfare and Institutions Code.

2

Sophia, but Frank got behind Brianna and wrapped his arm around her neck. When Brianna broke free, she and Stephanie drove with Sophia to a nearby restaurant where they called the police. Frank fled the scene to avoid arrest. Stephanie and Brianna reported this was the first time they had known Frank to become physically violent.

On May 12, 2014, a Department social worker interviewed mother at her apartment. Mother reported that she had been in a relationship with Frank for about a year and had shared the apartment with him for two months. She witnessed Frank arguing with Stephanie and Brianna outside the apartment, but claimed she took Makayla upstairs before the reported violence occurred. She acknowledged Frank and Stephanie had a confrontational relationship, and said she did not want them to "drag her into their mess." When asked about Makayla's father, mother said he was not in Makayla's life, that Frank had "played the father role," and that Makayla referred to Frank as "dad."

The social worker noted that mother's apartment appeared free of clutter and safety hazards and that Makayla was well cared for "in clean matching clothing with maintained hygiene." She observed Makayla to be happy running around the home, playing with both Frank and mother. The social worker performed a complete body check of Makayla and did not observe any visible bruising on the child.

On May 13, 2014, the social worker contacted mother about participating in a safety plan. She explained that Frank's child, Sophia, had been removed from his care in a separate dependency proceeding due to the physical assault on Brianna and that the Department therefore considered Makayla to be at risk due to Frank's cohabitation in mother's apartment. Mother agreed to move out of the apartment until the court hearing for Sophia.

On May 19, 2014, the social worker contacted mother again about the safety plan, following the hearing in Sophia's dependency case. The social worker reiterated that since Sophia had been detained from Frank, the Department considered Makayla to be at risk so long as she continued to share an apartment with Frank. Mother agreed that Makayla "comes first" and reported that "as of today" Frank would temporarily move out of the home.

On June 11, 2014, the Department held a team decision meeting with mother to discuss how Makayla's case should proceed. The Department noted that mother had a strong family support system, she provided adequate care for Makayla, and she and Makayla appeared bonded. On the other hand, the Department expressed concern that mother did not fully appreciate the risk posed to Makayla by her ongoing relationship with Frank. Mother said she understood the Department's concern, but explained that she did not feel Frank posed a threat to Makayla as he had never been aggressive toward her or the child. She reported that she remained in a relationship with Frank, but said she had been abiding by the safety plan and Frank had moved out of the apartment. Mother was emotional and crying, she felt the Department's involvement was unwarranted because "none of the incident [with Frank, Stephanie and Brianna] had to do with her and yet she and her child [had been] dragged into it." The Department maintained mother and Makayla were "involved" and Makayla was "considered at risk" because she "lived in the home with Frank while his child was detained from his care." Mother affirmed Frank would "stay out of the apartment until the court case is over"; she said she was "tired of being pulled into things that [had] to do with Frank and Stephanie," she was upset that those issues were "now affecting her child," and she "just wanted to have her family."

On June 17, 2014, the social worker visited mother and Makayla at their apartment. The social worker walked through the apartment and verified that Frank's clothing had been removed and he appeared to have moved out. Mother could not provide an address for Frank as he was "living with different people." She said they were still "together," but she had not spoken with him since he moved out.

On June 27, 2014, the social worker visited mother and Makayla again at the apartment. The social worker confirmed that Frank had not moved back into the home. Mother affirmed she and Frank were still together, but had not been talking much due to the incident with Stephanie and Brianna. She also provided the social worker with verification of her enrollment in a parenting class and confirmed she had attended two

4

sessions. The social worker observed Makayla to be clean with maintained hygiene and no visible marks or bruises on her body.

On July 2, 2014, the Department filed a non-detain report concerning Makayla. The report affirmed that mother had moved Frank out of the apartment, she had complied with all the Department's demands, including testing negative for drug use, and she had enrolled in a parenting class. Nevertheless, the Department maintained that mother's conduct amounted to "general neglect" as evidenced by the fact that mother "continued to permit Frank to live in the home even though Frank engaged in an altercation while his child [Sophia] was present." The report concluded, "Even though there are no concerns with mother and her care of Makalya [*sic*], the department is respectfully requesting a non-detain by the fact that mother continues to deny that there was a physical altercation between Frank and his minor sister, Brianna, in the presence of his child, Sofia [*sic*], and mother stated that she does not see how Frank is a danger to her child." The juvenile court entered the non-detain order and ordered Makayla released to mother's custody pending a subsequent hearing.

On July 21, 2014, the Department filed the operative second amended dependency petition with the following identical allegations under section 300, subdivisions (a) and (b): "On 05/14/2014, the child Makayla [M.]'s mother, Crystal [L.]'s male companion, Frank [Z.] engaged in a violent altercation with an unrelated female, Brianna [H.], in his child, Sophia's presence. The male companion struck the unrelated females [*sic*] face with the male companion's fist. The male companion choked and pushed the unrelated female. The child, Makayla [M.]'s mother, Crystal [L.] has failed to protect the child, Makayla [M.] as she continues to be involved in a relationship with her current boyfriend, Mr. Frank [Z.], *who continues to reside in the home of mother*. The mother's negligence endangers the child's physical health and safety and places the child at risk of physical harm and damage." (Italics added.)

On July 25, 2014, the Department filed a Jurisdiction/Disposition Report. The report reaffirmed the Department's recommendation that the juvenile court exercise jurisdiction over Makayla based on the allegations in the petition. In particular, the report noted that although mother denied Frank was still living in her home, she had posted an image of herself with Frank to social media on June 30, 2014 with the hash tags "#mylove #always #forever-with Frank [Z.]" The report also highlighted a July 6, 2014 social media post in which mother referred to Frank as her "hubby" and indicated they were watching a movie together at a theater in Whittier. Finally, the report noted that Stephanie and Brianna speculated Frank was still living with mother, since they were certain he was not living in his car, as he previously stated. Based on the foregoing, the Department maintained mother was being deceptive about Frank no longer residing in the apartment with Makayla.

In advance of the contested jurisdiction hearing, the Department filed two separate last minute information statements. According to the first, on August 15, 2014, a dependency investigator assigned to Frank attempted to make an unannounced visit at mother's apartment. When no one answered, the investigator left her business card on the door, with a request that Frank call the Department regarding Sophia. As the investigator was leaving, she observed a car parked in the apartment complex's gated area that matched the description of Frank's car. The investigator also observed a male covered in a blanket sleeping in the passenger seat. The male kept himself covered until the investigator entered her car five minutes later, at which time the male started his car and left the complex through an opposite entrance. As he was driving away, the investigator observed a parking sticker on the car's bumper indicating it was registered to park in the complex. Based on this incident, the Department maintained Frank was still living in mother's apartment.

On August 18, 2014, three days after the investigator observed Frank's car in the apartment complex's gated area, mother called to advise her social worker that she recently moved into a one-bedroom apartment with her aunt. In its last minute information statement, the Department reported that its social worker had visited the new

apartment, observed Makayla's clothes in the bedroom closet, and verified that mother and Makayla slept in the bedroom, while mother's aunt slept in the living room. Mother's aunt explained that she would allow mother and Makayla to stay with her until mother found a new apartment. Mother also reported that she had obtained a job and that the maternal grandmother would babysit Makayla while mother was at work.

On August 22, 2014, the juvenile court held the contested hearing on the Department's petition. The Department submitted on its reports and mother testified on her own behalf. Mother initially testified that she ended her relationship with Frank in June, when the court in Sophia's case determined that Frank had battered his sister outside mother's apartment. Mother recanted that testimony on cross-examination, when she admitted she continued to see Frank in July. She maintained, however, that Frank had moved out of her apartment, as confirmed by the social worker's reports, and had no further contact with Makayla since then. With respect to the recent visit by Frank's dependency investigator, mother testified that she found the investigator's card on her apartment door and asked her neighbor whether someone had been looking for Frank. When the neighbor told her the investigator visited and that she believed Frank had been in the parking lot, mother testified she left the apartment and had not gone back since. She said Frank did not know where she currently lived and she had no plans to restart a relationship with him.

The Department argued its evidence established mother maintained a relationship with Frank after he struck his sister and, therefore, mother had the burden—"like an affirmative defense"—to demonstrate the relationship was truly over. The Department also referred to mother's past statements in which she said she would keep Frank out of the house "just [until] the court case closes," and concluded "we'd like to delay that occurrence for a little while and have jurisdiction for six months because this minor is at risk."

7

Makayla's counsel joined with mother's counsel in arguing the petition should be dismissed. While Makayla's counsel acknowledged mother had been "somewhat reluctant to break off ties" with Frank when the incident occurred, he noted that mother had since taken significant measures to ensure Frank would have no contact with Makayla, including going "as far as to leave her residence and move in with a relative [when] [Frank] had appeared unexpectedly at the complex." Because mother had demonstrated her intention to cut off all ties with Frank, Makayla's counsel argued there had been no "showing of a future risk of harm for my client."

The juvenile court dismissed the allegation under section 300, subdivision (a), but sustained the allegation under subdivision (b), concluding mother failed to protect Makayla from a present risk of substantial physical harm. In that regard, the court emphasized the severity of Frank's battery upon his sister and mother's initial failure to acknowledge Frank's misconduct. The court also stated it had "some issues with regards to [mother's] credibility," noting that mother maintained ties with Frank after the court in Sophia's case made findings confirming his violent conduct. Finally, in view of the fact that Makayla had referred to Frank as "dada," and that Frank had been "lingering in the vicinity" of the apartment, the court concluded "a little bit more monitoring needs to be made." Thus, the court sustained the section 300, subdivision (b) allegation and ordered informal supervision by the Department pursuant to section 360, subdivision (b). Mother's counsel and Makayla's counsel joined in objecting to the section 300, subdivision (b) finding, reiterating their position that there was no evidence to support the allegation that Frank "continues to reside in the home of the mother."

8

## DISCUSSION

In some cases, when a child is placed in the home of a parent, and the parent is cooperative and able to work with the Department, the juvenile court may order informal supervision by the Department, in lieu of declaring the child a dependent. (See § 360, subd. (b); Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2009) § 2.124[2], pp. 2-283 to 2-284.) Section 360 authorizes an order for informal supervision as follows: "After receiving and considering the evidence on the proper disposition of the case, the juvenile court may enter judgment as follows: [¶] . . . [¶] (b) *If the court finds that the child is a person described by Section 300*, it may, without adjudicating the child a dependent child of the court, order that services be provided to keep the family together and place the child and the child's parent or guardian under the supervision of the social worker for a time period [of six months to a year]." (Italics added.) As the italicized text plainly states, although the juvenile court does not declare the child a dependent, it nevertheless must find sufficient evidence under section 300 to take jurisdiction over the child before the court may order informal supervision pursuant to section 360, subdivision (b).[2]

---

[2]     Regarding the relationship between the jurisdictional finding and the order for informal supervision under section 360, subdivision (b), Seiser and Kumli explain, "If the court . . . orders a program of informal supervision, it does not dismiss the dependency petition or otherwise set it aside. The true finding of jurisdiction remains. It is only the dispositional alternative of declaring the child a dependent that is not made. This is because if the family is unwilling or unable to cooperate with the services being provided, the social worker may institute proceedings pursuant to [section] 332 (petition to commence proceedings), alleging that a previous petition has been sustained and that informal supervision was ineffective. [Citation.] After hearing the petition, the court may either dismiss it or order a new disposition hearing . . . ." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure, *supra*, § 2.124[2], pp. 2-283 to 2-284, citing § 360, subd. (c).).

9

In the instant case, the juvenile court concluded it had jurisdiction pursuant to section 300, subdivision (b). Under that statute, the juvenile court may subject a child to the court's jurisdiction if it finds by a preponderance of the evidence that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness," as a result of a parent's failure or inability to adequately supervise or protect the child. (§ 300, subd. (b).)

" 'The statutory definition consists of three elements: (1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the minor, or a "substantial risk" of such harm or illness.' [Citation.] The third element 'effectively requires a showing that at the time of the jurisdiction hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur). [Citations.]' [Citation.] Section 300, ' ["]subdivision (b) means what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a substantial risk of serious physical harm or illness." [Citation.]' " (*In re David M*. (2005) 134 Cal.App.4th 822, 829 (*David M.*), italics omitted.)

Mother contends the Department failed to make the requisite showing that, at the time of the jurisdiction hearing, Makayla was at substantial risk of serious physical harm in the future. We agree. As we detailed in our statement of facts, the Department's evidence in regard to that showing consisted of the following: (1) on May 5, 2004 when Frank's battery upon his sister occurred, Frank shared an apartment with mother and Makayla, and Makayla referred to Frank as "dada"; (2) within two weeks of the incident, on May 13, 2014, mother complied with the safety plan formulated by the Department and moved Frank out of the apartment, as confirmed in two subsequent visits to the apartment by the Department's social worker on June 17, 2014 and June 27, 2014; (3) despite moving Frank out of the apartment, mother continued her relationship with him, as confirmed by an image of her and Frank posted to social media on June 30, 2014 with the hash tags "#mylove #always #forever-with Frank [Z.]" and a subsequent post on July 6, 2014 in which mother referred to Frank as her "hubby" and indicated they were

10

watching a movie together outside the apartment; (4) on August 15, 2014, a dependency investigator observed Frank's car, with a parking sticker, in the gated area of mother's apartment complex and a man (presumably Frank) sleeping in the car's passenger seat; and (5) on August 18, 2014, a social worker visited mother at her aunt's apartment, confirmed with mother's aunt that mother and Makayla had moved into the apartment, and observed Makayla's clothes hanging in the bedroom closet.

Drawing all reasonable inferences in favor of the juvenile court's finding, the foregoing evidence shows, at most, that mother was initially reluctant but ultimately committed to moving Frank out of the apartment, she continued her relationship with Frank but saw him outside the home, and Frank had access to the apartment's parking area but mother and Makayla no longer lived in the apartment at the time of the contested jurisdiction hearing. Even under our deferential standard of review, this evidence does not establish, as the Department alleged in its petition, that Frank "continue[d] to reside in the home of the mother," nor does it support a reasonable inference that mother's conduct at the time of the jurisdiction hearing placed Makayla at a present substantial risk of serious physical harm. (§ 300, subd. (b); *David M., supra,* 134 Cal.App.4th at p. 829.)

We understand the trial court's concern over mother's early reluctance to acknowledge the severity of Frank's misconduct and take appropriate action to protect Makayla in the direct aftermath of the triggering incident. However, while past neglect can certainly be an indicator of future risk of harm, mother's initial reluctance, in light of her more recent conduct in this case, is not enough to exercise jurisdiction over this child. " 'While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm. [Citations.]' [Citation.] '[P]revious acts of neglect, standing alone, do not establish a substantial risk of harm; there must be some reason beyond mere speculation to believe they will reoccur. [Citations.]' " (*David M., supra,* 134 Cal.App.4th at pp. 831-832.) The Department's evidence, consisting principally of two three-month-old social media posts, did not permit a reasonable inference that mother would allow Frank to place Makayla at risk of harm in the future.

11

Nor is the juvenile court's credibility finding against mother sufficient to bridge the evidentiary void. While we will not second guess the "issues" the court had with mother's credibility, it is well settled that a plaintiff cannot satisfy its evidentiary burden merely by casting doubt on the credibility of the opposing party's testimony. "The rejection of a witness's testimony by the trier of fact has only the effect of removing that testimony from the evidentiary mix. Without more, the disregard or disbelief of the testimony of a witness is not affirmative evidence of a contrary conclusion. [Citations.] In other words, the fact that the trier of fact does not credit a witness's testimony does not entitle it to adopt an opposite version of the facts which *otherwise lacks evidentiary support*." (*Beck Development Co. v. Southern Pacific Transpiration Co.* (1996) 44 Cal.App.4th 1160, 1205-1206, italics added.)

Contrary to the Department's argument at the jurisdiction hearing, mother did not bear the burden, "like an affirmative defense," of proving her relationship with Frank was truly over. Rather, the Department had the burden of proving, by a preponderance of the *evidence*, that mother's conduct created a current and substantial risk that Makayla would suffer serious physical harm in the future. (§ 300, subd. (b).) The juvenile court's unwillingness to credit some or all of mother's testimony did not relieve the Department of its evidentiary burden. And, because the Department failed to meet this burden, the court had no evidentiary basis for its exercise of jurisdiction. Without jurisdiction, the court had no authority to subject Makayla to informal supervision under section 360, subdivision (b).

**DISPOSITION**

The jurisdictional finding is vacated and the informal supervision order is reversed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

EDMON, P. J.

EGERTON, J. [*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13